McGEE, Judge.
The Yadkin County Department of Social Services (DSS) filed a juvenile petition on behalf of F.L.R. on 16 September 2002. The petition sought to terminate the parental rights of H.B.R. and J.R. (collectively respondents), who are the parents of F.L.R. The petition alleged that H.B.R. had her parental rights terminated for two of her children by the State of Idaho in 1997, and that neglect had been "substantiated against [respondents] in Surry County, North Carolina, on September 23, 1999, due to their excessive alcohol consumption and domestic violence." The petition also alleged that DSS became involved on 9 July 2001 when F.L.R. "wasfound in the care of [H.B.R.] who was extremely intoxicated and there were no other sober adults to care for [F.L.R.] in the home." The petition further alleged that on 3 August 2001, "it was determined that after an episode of domestic violence between [respondents] who were both drinking alcohol, [J.R.] was arrested, blew a .19 on a breathalyzer and [was] incarcerated and [H.B.R.] admitted to [respondents'] transporting [F.L.R.] in an automobile when both [respondents] were under the influence of alcohol." The petition further alleged that on 27 August 2001, F.L.R. was adjudicated a neglected child and was placed in the custody of DSS by the Yadkin County District Court.
The petition stated that respondents agreed to treatment plans and that at their ninety-day review hearing on 19 November 2001, they appeared to be making progress; however, in December 2001, both respondents had positive drug tests. The petition also alleged that visitations between respondents and F.L.R. were suspended, and that respondents "fled the area sometime after the first of February, 2001." It was alleged that at the time the petition was filed, respondents were incarcerated in Florida and had been charged with "various criminal offenses in Florida and North Carolina." Finally, the petition alleged that respondents had not "had any involvement with [DSS] or [F.L.R.] since May [2002]" and that DSS had been relieved "from making further efforts for reunification of [F.L.R.] to [respondents] on July 29, 2002." Hearings were held regarding this petition on 2 and 21 April 2003. Present at the hearings were respondents, DSS and theGuardian Ad Litem (GAL) for F.L.R. The trial court found by clear, cogent and convincing evidence that H.B.R. "had her parental rights to two children involuntarily terminated" in Idaho in October 1997, and that another of her children "went to live with her paternal grandmother before Idaho authorities became involved." The trial court also found that respondents had a history of excessive drinking and domestic violence, and that:
[DSS] first became involved with [F.L.R.] and her family on 9 July 2001 through a report alleging alcohol abuse and domestic violence while caring for [F.L.R.]. [DSS] responded to a report on that date that [H.B.R.] was hanging out of a window screaming for someone to help her. [J.R.] was extremely intoxicated and had passed out at the residence by the time law enforcement officers arrived. Both [respondents] denied domestic violence had occurred between them.
. . . .
On 3 August 2001, [DSS] received a call from Stokes County DSS that [J.R.] had been arrested and charged with two counts of assault on a female, assault on a child under 12, DWI, communicating threats, and second degree trespass. The victim of the assault on a child under 12 was [F.L.R.], and the victims of the assaults on females were a neighbor and [H.B.R.]. After leaving the scene of the assaults, [J.R.] was stopped for driving while impaired and registered a .19 BAC on an Intoxilyzer test. He admitted he had been drinking since the night before. [H.B.R.] informed the social worker that [J.R.] drank like that at least twice per week. Again, both [respondents] denied domestic violence and that [J.R.] assaulted [F.L.R.], even though [J.R.] was later convicted of assaulting [F.L.R.] and [H.B.R.] during the altercation.
The trial court also found that F.L.R. was removed from respondents' home after the above incident occurred, and thatduring the 27 August 2001 session of Yadkin County Juvenile Court,
[t]he parties stipulated that [F.L.R.] was a "neglected juvenile" as that term is defined by N.C.G.S. 7B-101. The Court specifically found that "it is in the best interest of [F.L.R.] for [H.B.R.] and [J.R.] to participate in psychiatric, psychological, or other treatment or counseling directed toward remediating or remedying behaviors or conditions that led to or contributed to [F.L.R. being] adjudicated neglected and the Court's decision to remove custody from the parents." The parents agreed to, and were ordered to, comply with the plan of treatment recommended by [DSS].
[H.B.R.] initially was very cooperative and completed many conditions of her treatment plan. She completed a psychological evaluation and a substance abuse evaluation before the 19 November 2001 court review. She nearly completed the SCAN parenting program, attending ten out of twelve classes. She was in a domestic violence group and was attending as required, but she denied any domestic violence in her home since [F.L.R.'s] birth. She minimized [J.R.'s] problems with alcohol by saying that he did not usually drink.
The trial court further found that J.R. was incarcerated from the 3 August 2001 incident until just before the 19 November 2001 review date, because he was convicted on two counts of assault on a female, one count of assault on a child, and driving while impaired, among other things. The trial court also found that:
[J.R.] did complete a psychological assessment in December 2001 and a substance abuse assessment in January 2002, though he did not follow through with the recommendations of either. He attended two sessions with Lee Booher as directed for anger management and domestic violence but he did not return for further counseling and did not pay for the two sessions. As was the case with [H.B.R.], [J.R.] denied any domestic violence between the parties after [F.L.R.'s] birth.
[H.B.R.] tested negative for drugs in five out of six drug screens given primarily between 31 December 2001 and 15 February 2002. She tested positive for propoxphene on 31 December 2001 and could produce no prescription or valid medical records to account for the positive test.
[J.R.] tested positive for marijuana and alcohol on 31 December 2001. He tested positive for marijuana again on 10 January 2002. He called on 18 February 2002 and wanted a drug screen, but his urine sample on 19 February 2002 had an out-of-range temperature and [J.R.] stated that he could not give another sample because he had to leave. [J.R.] was reminded to go back to treatment.
Visits between [respondents] and [F.L.R.] were stopped after the positive drug screens on 31 December 2001. Visits with [H.B.R.] were reinstituted on 4 March 2002, and she visited [F.L.R.] twice after that date and before leaving the area.
[Respondents] left Yadkin County for Florida around mid-March, 2002. Neither [respondent] notified [DSS] or the Guardian Ad Litem office before leaving. Neither left an address or a phone number where they could be reached in case of an emergency involving [F.L.R.]. Neither checked on [F.L.R.] for months. Neither kept in contact with their attorney concerning the proceedings involving their daughter.
Criminal charges were pending against [J.R.] at the time [respondents] left and [J.R.] was on probation. On 19 February 2002, [J.R.] committed the following offenses: driving while license revoked; fictitious information to an officer; no insurance; no registration; fictitious registration; and resist, obstruct, and delay [of] a public officer. [J.R.] committed the offense of Accessory After the Fact on 15 March 2002 and Felonious Uttering on 18 March 2002.
. . . .
Another review hearing was conducted on 13 May2002, and neither [respondent] attended. The Court ordered that "if [respondents] have made no further progress within three (3) months, the plan should be changed to termination of parental rights."
On 19 May 2002, both [respondents] were arrested on charges of aggravated assault in Marion County, Florida, and were incarcerated.
[DSS] did not become aware of [respondents'] whereabouts until 19 May 2002, when a relative contacted [DSS]. Cathy Troutner of [DSS] had no contact with [H.B.R.] until August 2002, when [H.B.R.] wrote a letter.
. . . .
On 29 July 2002, a Permanency Planning Hearing was conducted. Neither [respondent] appeared, as both [respondents] were still incarcerated in Florida. [H.B.R.] did send a written "Answer". Filed with the Yadkin County Clerk of Court on 29 July 2002, asking for a continuance of the hearing and stating that she did not want [F.L.R.] to be [permanently] somewhere without me." The motion to continue was denied. The plan was changed to termination of parental rights.
The trial court found that DSS filed a petition to terminate respondents' parental rights on 16 September 2002, and that
[o]n 26 September 2002, [H.B.R.] finally called Ms. Troutner [of DSS] and advised Ms. Troutner of her whereabouts. [H.B.R.] asked how "to get [F.L.R.] back." [H.B.R.] was told that [DSS] had been relieved of making reasonable efforts and that a TPR petition had been filed, but that [respondents] could still follow through with recommendations through their own efforts. Ms. Troutner has called the respondents twice since that date, but the respondents have not contacted her.
On 16 October 2002, [J.R.] was released from jail. On 8 October 2002, [H.B.R.] was released.
The trial court reviewed the evidence of changed circumstancespresented by respondents and found by clear, cogent, and convincing evidence, that:
Both [respondents] are now on probation in Florida, and are ordered to be drug tested.
Both [respondents] are now working, and living in Wildwood, Florida. [J.R.] has had various jobs since going to Florida. As of the TPR hearing date, [respondents] have been living in the same residence for four months. Before living in this residence, [respondents] lived with [J.R.'s] mother and stepfather for approximately three months.
The respondents' evidence was that there has not been domestic violence between them in Florida. [J.R.] denies marijuana use since March 2002, and states that he had done no excessive drinking for several months. Several of [J.R.'s] relatives testified that there had been no domestic violence and no substance abuse by [J.R.] in recent months; however, many of these same witnesses were unaware of, or denied, established domestic violence between [respondents] and previous substance abuse. Some were unaware of [J.R.'s] extensive criminal history, or even the fact that he was on probation.
The trial court found that [F.L.R.] had been "removed from the respondents' home due to domestic violence between [respondents] and alcohol abuse by [respondents]" and that:
Although [H.B.R.] completed most of her parenting classes and attended some counseling sessions concerning domestic violence, she did not complete these programs. More disturbing is the fact that she has never acknowledged domestic violence from [J.R.] after [F.L.R.'s] birth, even though it has been found in various court orders that domestic violence did occur, and a criminal court convicted [J.R.] of assaults against [H.B.R.] and [F.L.R.].
[J.R.] attended only two sessions relating to domestic violence and did not return. It is equally troubling that he does not acknowledgedomestic violence toward [H.B.R.] even though he was convicted of the same. Even in testimony in this hearing, he continued to deny that he "put his hands on [H.B.R.]" and stated that he pled "guilty" to get out of jail. He later admitted that he pled "not guilty" and was convicted after a trial.
The trial court further found that though [H.B.R.] "did not meet the criteria for abuse or dependency on substances at the time of the assessment," she did not complete the plan to attend Alanon and Narcotics Anonymous/Alcoholics Anonymous meetings that was recommended by DSS. The trial court also found that [J.R.] "received a diagnosis of `alcohol dependence in partial remission and cannabis abuse' in the substance abuse assessment conducted 10 January 2002," but that J.R. did not submit himself for the recommended outpatient treatment. The trial court noted:
[J.R.] did not return on 17 January 2002, as directed, to complete the treatment plan and receive his recommendation, even though he agreed to return and "presented as willing to do whatever was necessary to get his children returned". He also failed to return for the next two rescheduled appointments and never returned thereafter.
The trial court incorporated into its findings of fact respondents' psychological evaluations conducted by Dr. Dorothy Dionne in August and September 2001 and December 2001 and then found that:
Dr. Dorothy Dionne stated, and the Court finds as a fact, that the issues that [respondents] have need structured intervention to be resolved, and that these issues are unlikely to resolve on their own. [J.R.] is in need of therapy to address substance abuse, emotional [liability] and poor judgment in order to avoid further criminal behavior and to be an effective parent.
Although Ms. Troutner [made] it clear to [respondents] that they could still make efforts on their own to complete counseling and to address issues of concern, [respondents] have largely chosen not to do so. They are now working and have maintained the same residence for some months, and they have family support available; however, neither [respondent] has made any effort to complete any of the counseling or treatment required by [DSS].
The Court notes that both [respondents] have made statements to DSS workers and others that they were willing to do whatever they needed to do to get [F.L.R.] back, but both have generally failed to follow through with actions to demonstrate this. Although [respondents] clearly love [F.L.R.], they lack the understanding and motivation to act in their child's best interest.
The trial court then made the following conclusions of law:
1. Based upon the foregoing findings of fact, the Court concludes as a matter of law that grounds exist for the termination of the parental rights of the parents of this child, under the provisions of G.S. 7B-1111 in that:
(A) they have willfully left [F.L.R.] in foster care for more than 12 months without showing reasonable progress under the circumstances has been made in correcting the conditions which led to her removal, and
(B) the parental rights of [H.B.R.] with respect to two of her other children have been terminated involuntarily by a Court of competent jurisdiction, and
(C) the parents have neglected [F.L.R.] within the meaning of G.S. 7B-101, and
(D) with reference to the ground of neglect, even after considering evidence of changed circumstances, the Court concludes that a repetition of neglect is likely.
2. That it is in the best interest of[F.L.R.] that [respondent's] parental rights be terminated so that she may be placed for adoption, and the Court finds the grounds alleged in the petition sufficient to terminate parental rights.
At the disposition phase of the hearing, the trial court made additional findings regarding the needs and emotional development of [F.L.R.] and found "[t]hat there is no reasonable hope that within a reasonable period of time [respondents] can correct the conditions to provide for the emotional and physical needs of [F.L.R.]" The trial court further found that "[t]he Guardian Ad Litem concurs with [DSS's] recommendations that respondent parents' parental rights be terminated." Respondents appeal.
Although respondents do not directly controvert the findings of the trial court, they argue that some of the trial court's findings of fact were not supported by clear, cogent, and convincing evidence and that the facts do not support the trial court's conclusions of law. Respondents emphasize how they have complied with the treatment plans recommended by DSS and the steps that they have taken to change their lives. Respondent J.R. also asserts that the trial court abused its discretion in making its disposition and that the trial court erred in not entering its order in the requisite time period. Pertinent facts, as respondents allege them, are set forth in the discussion below. Respondent H.B.R. does not make any arguments on her assignments of error four, ten, eleven, and twelve, and these assignments of error are deemed abandoned. N.C.R. App. P. 28(b)(6).
I.
When reviewing an order for termination of parental rights, we must "determine whether the trial court's findings of fact were based on clear, cogent, and convincing evidence, and whether those findings of fact support a conclusion that parental termination should occur on the grounds stated in N.C. Gen. Stat. [§ 7B-1111 (formerly § 7A-289.32)]." In re Oghenekevebe, 123 N.C. App. 434, 435-36, 473 S.E.2d 393, 395 (1996). We will affirm a trial court's order when the findings of fact support a conclusion on grounds set forth in N.C.G.S. § 7B-1111. In re Swisher, 74 N.C. App. 239, 240, 328 S.E.2d 33, 35 (1985). A trial court may terminate parental rights if one or more of the grounds set forth in N.C.G.S. § 7B-1111(a) is established. The grounds relevant to the present case are:
(1) The parent has abused or neglected the juvenile. . . .
(2) The parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile. . . .
. . . .
(9) The parental rights of the parent with respect to another child of the parent have been terminated involuntarily by a court of competent jurisdiction and the parent lacks the ability or willingness to establish a safe home.
N.C. Gen. Stat. § 7B-1111(a) (2003). The trial court made conclusions of law based on these three grounds and respondents challenge those conclusions of law. We affirm.
A.
Respondents first argue that the trial court's conclusion of law stating that respondents neglected F.L.R. was not supported by the findings of fact. As noted above, neglect is one such ground for termination of parental rights. N.C.G.S. § 7B-1111(a)(1). A juvenile is neglected when the juvenile does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101 (2003). Parental rights may not be terminated based only upon past conditions of neglect that "no longer exist." See In re Ballard, 311 N.C. 708, 714, 319 S.E.2d 227, 231-32 (1984). However, because often a minor child is not in the custody of the parents at the time of the termination of parental rights hearing, "evidence of neglect by a parent prior to losing custody of a child - including an adjudication of such neglect - is admissible in subsequent proceedings to terminate parental rights." Id. at 715, 319 S.E.2d at 232. A trial court must also consider any changed conditions, but it must consider these "changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." Id. The trial court in the present case adhered to this standard.
Respondents argue that the trial court erred because it primarily focused on past conditions of neglect and did not giveenough weight to the positive progress they had made in their lives. Respondents further assert that their progress eliminated the likelihood of any future neglect of F.L.R., if she were returned to their care. We disagree. The trial court specifically concluded that "with reference to the ground of neglect, even after considering evidence of changed circumstances, the Court concludes that a repetition of neglect is likely." As discussed below, this conclusion of law is supported by the findings of fact, which in turn are supported by clear, cogent and convincing evidence.
In its findings of fact, the trial court expressly stated:
This Court is cognizant of the fact that, in order to find the "neglect" ground for termination of parental rights has been proven, the Court must consider any evidence of changed circumstances viewed in the light of the probability of a repetition of neglect if the child is returned to the parents, and must consider the parents' fitness as of the date of the termination hearing.
The trial court then made findings about changed conditions, including: both respondents were working, there had been no domestic violence between respondents since they had been in Florida, and that J.R. had denied any substance abuse for many months. However, the trial court also found that these changed circumstances did not address the original reasons why F.L.R. was removed from respondents' care. F.L.R. was removed from respondents' home after several incidents of domestic violence in which one or both of respondents were extremely intoxicated. As the trial court found, "[F.L.R.] was removed from the respondents' home due to domestic violence between the parents and alcohol abuseby the parents. There were also concerns about the [respondents'] instability, drug use, and the termination of [H.B.R.'s] parental rights to two other children."
Additionally, the trial court found that respondents had not complied with the treatment plan recommended by DSS despite both respondents agreeing to the treatment plan and being ordered to comply with the plan to avoid termination of parental rights. When F.L.R. was adjudicated neglected on 27 August 2001, the trial court found that
it is in the best interest of [F.L.R.] for [respondents] to participate in psychiatric, psychological, or other treatment or counseling directed towards remediating or remedying behaviors or conditions that led to or contributed to the minor child being adjudicated neglected and the Court's decision to remove custody from the parents.
Neither respondent fully complied with these recommendations.
H.B.R. substantially complied with her treatment plan: she attended ten out of twelve of the parenting classes, she tested positive only on her first of six drug tests, and she contends that this one positive test was a result of her taking prescription medication. However, she did not complete the recommended treatment and left for Florida in March 2002 without notifying DSS or F.L.R.'s GAL. The trial court noted that:
[H.B.R.] was doing a good job of following DSS directives until [J.R.] was released from jail. After this, [H.B.R.'s] situation worsened, and she left the state with [J.R.] to the clear detriment of her daughter and to her chances of her getting her daughter returned to her. [H.B.R.] appears to have blindly followed [J.R.] in an exercise of very poor judgment.
Respondent J.R., on the other hand, did not substantially comply with his treatment plan. The trial court found that J.R. "attended only two sessions relating to domestic violence and did not return," and that he never submitted himself for the outpatient treatment for substance abuse that was recommended for him.
Respondents do not dispute any of the above facts. Rather, respondent H.B.R. argues that respondents' changed circumstances, i.e., having a home and jobs in Florida, should outweigh the fact that they did not take steps to get the "psychiatric, psychological, or other treatment or counseling" that was advised. Similarly, respondent J.R. argues that he did comply with the recommendations made by DSS, asserting that although he did not receive any professional drug or alcohol treatment, he had not used drugs or alcohol for several months before the termination proceeding. He further asserts that he had a home and job in Florida, and that he had not been in "trouble with the law" since March 2002. He also asserts that while he did not receive counseling or other professional therapy, he has "made profound life changes that were the contemplated goal of the counseling." He argues that he "has worked with family and friends, and attended church to fulfill his need for emotional strengthening." J.R. further asserts that "DSS is not the only solution" and that he complied with DSS's recommendations, just not in the way DSS wanted.
However, we are not persuaded by respondents' arguments that their changed conditions would reduce the likelihood of repetitionof neglect. In the present case, respondents agreed to, and were ordered to comply with, DSS's recommendations for treatment. As part of this treatment, respondents were to receive "psychiatric, psychological, or other treatment or counseling." Having a house and jobs and attempting to meet the goals of counseling through talking to family and friends does not satisfy the treatment plan. We agree with the trial court's finding that though "both parents have made statements to DSS workers and others that they were willing to do whatever they needed to do to get [F.L.R.] back . . . both have generally failed to follow through with actions to demonstrate this."
Respondents further contend that the trial court erred in concluding that F.L.R. was neglected when it failed to find neglect at the time of the hearing. Respondents assert that "[a] finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997)(citing Ballard, 311 N.C. at 716, 319 S.E.2d at 231-32). However, when "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect." In re Shermer, 156 N.C. App. 281, 286, 576 S.E.2d 403, 407 (2003). As discussed above, evidence showing neglect at the time of the termination proceeding includes evidence of past neglect provided that the trial court also considers any changed conditions. Ballard, 311 N.C. at 715, 319 S.E.2d at 232. These changed conditions must be viewed "in light of the evidence of prior neglect and the probability of a repetition of neglect." Id. We note, however, that in addition to the trial court's concluding that the changed circumstances made a repetition of neglect likely, the trial court also found other evidence indicating neglect at the time of the termination of parental rights proceeding.
Specifically, the trial court found that neither respondent "checked on [F.L.R.] for months" after they left for Florida in March 2002, and that neither was in touch with DSS until August 2002 when H.B.R. wrote DSS a letter. Other evidence showed that respondents did very little to support or care for F.L.R. during the entire time that she was in foster care. For instance, as we have previously ruled, "visitation by the parent is a relevant factor" in determining neglect. In re Pierce, 146 N.C. App. 641, 651, 554 S.E.2d 25, 31 (2001), aff'd, 356 N.C. 68, 565 S.E.2d 25 (2002). In the present case, respondents lost their visitation privileges after they each had positive drug tests. However, rather than make every effort to be able to visit and spend time with F.L.R., each chose to do things that sent the message that F.L.R. was less of a priority than themselves. J.R. did not have any negative drug tests in North Carolina so he did not ever regain the privilege of visiting with his daughter before he left for Florida. H.B.R. did have her visits reinstituted after a negative drug test, but then decided to forego these visits to follow J.R. to Florida. Another indication of neglect is the failure of a parent to provide parental guidance, personal contact, custodial and spiritual support, or love to the minor child during the six months prior to a termination proceeding. In re Ore, 160 N.C. App. 586, 589, 586 S.E.2d 486, 488 (2003); In re Pierce, 67 N.C. App. 257, 263, 312 S.E.2d 900, 904 (1984). However, the only evidence showing that respondents attempted to make personal contact with F.L.R. occurred two months after DSS filed its petition to terminate parental rights. Similarly, we note that it was only after the petition was filed that respondents got a home and jobs in Florida. This failure to provide parental guidance to, and personal contact with, F.L.R. is evidence not only that the probability of future neglect was high, but also that there was neglect at the time of the hearing. Thus, respondents' assignments of error on this issue are without merit.
B.
In addition to terminating parental rights on the grounds of neglect, the trial court terminated respondents' parental rights because respondents "willfully left [F.L.R.] in foster care for more than 12 months without showing reasonable progress under the circumstances . . . in correcting the conditions which led to her removal." See N.C.G.S. § 7B-1111(a)(2). Respondents argue that this conclusion of law constituted error because it was not supported by clear and convincing evidence. However, respondents do not dispute the substance of the trial court's findings of fact that support this conclusion of law. Rather, they argue that thetrial court placed improper weight on the one-time psychological evaluations performed on respondents in fall 2001 when the termination hearing was not conducted until April 2003. This psychological evaluation was the basis for DSS's recommendation that respondents receive professional counseling or treatment. Respondents argue that they made reasonable progress in the months between the psychological evaluation and the hearing. Respondent H.B.R. points to the fact that she substantially complied with the treatment plan recommended by DSS, and that she had a job and a home in Florida. Similarly, respondent J.R. asserts that he made reasonable progress because he completed eight of twelve parenting classes, had a job and a home in Florida, had not been convicted since March 2002, had not used marijuana since March 2002, nor alcohol since May 2002, and was being helped emotionally by friends and family. Respondents assert that they did everything required of them, other than receive the recommended counseling, and that the trial court did not give them credit for the progress they made. We disagree.
As discussed above, the trial court found that reasonable progress was not made to correct respondents' tendency for domestic violence and drug and alcohol use. These problems were the reasons F.L.R. was removed from respondents' home originally. The trial court also found that respondents' evidence was that there has not been domestic violence between them in Florida. [J.R.] denies marijuana use since March 2002, and states that he had done no excessive drinking for several months. Several of [J.R.'s] relatives testified thatthere had been no domestic violence and no substance abuse by [J.R.] in recent months; however, many of these same witnesses were unaware of, or denied, established domestic violence between [respondents] and previous substance abuse. Some were unaware of [J.R.'s] extensive criminal history, or even the fact that he was on probation.
The trial court further found that despite completing "most of her parenting classes" and attending "some counseling sessions on domestic violence," H.B.R. did not complete these programs. Similarly, despite J.R.'s evidence that he complied with the treatment plan, just not in the way DSS had wanted, the trial court found that J.R. "attended only two sessions relating to domestic violence and did not return." The trial court further found that neither respondent ever acknowledged domestic violence, even though various court orders found that domestic violence did occur between respondents and that J.R. had been criminally convicted of assaults against H.B.R. and F.L.R. In addition to being undisputed, these facts are clearly and convincingly supported in the record on appeal. The fact that respondents began to comply with DSS's treatment plan does not preclude them from willfully leaving their child in DSS's care when they ultimately abandoned efforts to comply with the recommended treatment plan. In re Tate, 67 N.C. App. 89, 94, 312 S.E.2d 535, 539 (1984) (holding that the appellant's initial efforts to comply with DSS's treatment plan did not preclude a finding of willfulness). Thus, the trial court did not err when it concluded that respondents failed to show reasonable progress under the circumstances in correcting the conditions which led to F.L.R.'s removal from respondents' home. Respondents also contest this conclusion of law on the grounds that they did not "willfully" leave F.L.R. in foster care for twelve months because they were incarcerated in Florida for much of that time. Respondents rely on In re Shermer, 156 N.C. App. 281, 576 S.E. 2d 403 (2003) to assert that lack of progress cannot be willful when they were incarcerated. But this is a broad reading of Shermer, in which our Court vacated an order terminating parental rights because there was insufficient evidence to show that the respondent had failed to make reasonable progress where he had been incarcerated prior to the filing of the petition. Shermer, 156 N.C. App. at 289-90, 576 S.E.2d at 409. Shermer is distinguishable from the present case, however. The respondent in Shermer was incarcerated for the entire twelve months prior to the filing of a termination petition and thus was not involved in the events that led to the removal of his child. Also, once the respondent became aware that his child was in foster care, he regularly wrote to and made contact with his child. Id. Moreover, the respondent in Shermer had only two months to comply with the treatment plan recommended by DSS before the hearing was held. Id. at 288, 576 S.E.2d at 408. We wrote in Shermer that "[t]o uphold the trial court's order, we must find that the respondent's failure was willful, which is established when the respondent had the ability to show reasonable progress but was unwilling to make the effort." Id. at 289, 576 S.E.2d at 409. In Shermer, the respondent was not given sufficient time to make an effort toward reasonable progress; therefore, we could not uphold the orderterminating his parental rights.
In the present case, however, respondents had significantly more than two months to comply with DSS's recommended treatment plan before they were incarcerated. F.L.R. was originally adjudicated to be neglected on 27 August 2001. Respondents were incarcerated in Florida on 19 May 2002 and DSS filed its petition to terminate respondents' parental rights on 16 September 2002. H.B.R. had more than eight months to comply with the recommended treatment plan, and J.R. had at least six months, since he was incarcerated in North Carolina from August 2001 until November 2001 for assaulting H.B.R. and F.L.R. As discussed above, H.B.R. significantly complied with the plan, but still did not complete the recommended classes and decided to go with J.R. to Florida without notifying either DSS or the GAL. J.R. made little effort to comply with the treatment plan before leaving for Florida and he also left without contacting DSS or the GAL. Neither respondent made any contact with DSS until ten days after DSS filed its petition and two weeks before H.B.R. was released from prison. Moreover, while respondents were incarcerated, neither had any contact with F.L.R. Respondents had one visit with F.L.R. on 16 October 2002 and thereafter sent her birthday and Christmas cards and gifts through the GAL, but not until after DSS had filed the petition to terminate parental rights. Thus, unlike the respondent in Shermer, respondents in the present case had many months prior to DSS filing its petition during which they could have taken steps to fully comply with DSS's recommended treatment. Respondent J.R. asserts that because DSS would not let him visit F.L.R., he could not have willfully left her in foster care. DSS did discontinue J.R.'s visits with F.L.R. when he had a positive drug test in December 2001. However, there is no indication that visits would not have been resumed if J.R. received a negative drug test. H.B.R. had her visits reinstated as soon as she tested negative for drugs. J.R. never had a negative drug test. He tested positive for marijuana and alcohol on 31 December 2001 and positive for marijuana on 10 January 2002. J.R. volunteered to have a drug test on 18 February 2002, but the temperature of his urine sample was outside the normal range and he left without giving another sample. Thus, J.R. lost his visitation privileges because of his non-compliance with DSS's recommended treatment plan and because of his drug use and criminal offenses. J.R. left the state and made no other efforts to contact F.L.R. We note that J.R. claims to have sent a check to DSS to support F.L.R. and claims that the check was returned to him. However, he provides no other corroborating evidence of sending this check, and he made no other attempt to support, care for, or spend time with F.L.R.
There is clear and convincing evidence that respondents willfully left F.L.R. in foster care for more than twelve months without showing that they had made reasonable progress in correcting the conditions which led to the removal of F.L.R. from their home. The trial court did not err in concluding that respondents' parental rights be terminated on this ground.
C.
Respondent H.B.R. argues that the trial court erred in terminating her parental rights on the ground that H.B.R.'s parental rights to other children had been terminated when the trial court did not find as fact that H.B.R. lacked "the ability or willingness to establish a safe home." See N.C. Gen. Stat. § 7B-1111(a)(9). The trial court concluded that terminating parental rights with respect to F.L.R. was proper because "the parental rights of [H.B.R.] with respect to two of her other children have been terminated involuntarily by a Court of competent jurisdiction." However, as H.B.R. asserts, this is an incomplete conclusion of law under N.C.G.S. § 7B-1111 (a)(9). H.B.R. correctly states that the trial court must additionally conclude that a parent "lacks the ability or willingness to establish a safe home." N.C.G.S. § 7B-1111 (a)(9). The trial court did not make a finding of fact addressing whether and how H.B.R.'s failure to comply with DSS's recommended treatment affected her ability to establish a safe home. Nor did the trial court refer to H.B.R.'s ability or willingness to establish a safe home in its conclusion of law. However, only one ground is necessary to terminate parental rights. N.C.G.S. § 7B-1111 (a). In our present case, as discussed above, there are two grounds for terminating parental rights that are supported by clear and convincing evidence. Thus, we dismiss this assignment of error.
II.
Respondent J.R. argues that the trial court abused itsdiscretion when it ordered his parental rights terminated at the disposition stage of the trial. A termination proceeding involves two stages: the adjudication and the disposition. In re Blackburn, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001). As discussed above, in the adjudication portion of the proceeding, the trial court must find at least one ground for the termination of parental rights, as set forth in N.C.G.S. § 7B-1111(a), by clear and convincing evidence. Blackburn, 142 N.C. App. at 610, 543 S.E.2d at 908. If one or more grounds for termination of parental rights are established by clear and convincing evidence, then the trial court proceeds to the disposition portion of the proceeding. Id. In its disposition, the trial court must consider the best interests of the child, and it "shall issue an order terminating the parental rights unless it further determines that the best interests of the child require otherwise." Id.; see also N.C.G.S. § 7B-1110(a). The trial court's decision to terminate parental rights is discretionary and "is reviewed on an abuse of discretion standard." In re McMillon, 143 N.C. App. 402, 408, 546 S.E.2d 169, 174, disc. review denied, 354 N.C. 218, 554 S.E.2d 169 (2001). A trial court's decision "is subject to reversal for abuse of discretion only upon a showing by a litigant that the challenged actions are manifestly unsupported by reason." Clark v. Clark, 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980).
Respondent asserts that the trial court abused its discretion in deciding to terminate parental rights in the present case because, as with the adjudication portion of the proceeding, thefindings of fact made during the disposition portion were based on "old information." Respondent claims that parental rights should only be terminated when there is "compelling evidence of potential risk of harm to the child or [the child's] well being," In re Nesbitt, 147 N.C. App. 349, 361, 555 S.E.2d 659, 667 (2001), and that this high standard was not met in this case. However, respondent does not demonstrate how the trial court abused its discretion. Other than again detailing the changes respondents have made, J.R. does not assert why F.L.R.'s best interests would be served by being with respondents.
In addition to incorporating into its disposition the findings of fact from the adjudication, the trial court found as part of its disposition that F.L.R. "needs a lot of `one-on-one' attention, and needs a very strong, self-confident figure to parent her who will be very consistent." J.R. does not contend that he and H.B.R. could provide F.L.R. this attention, nor does he offer any evidence that they would be strong, self-confident parental figures. He contends that F.L.R. seems to be no better off after a year in DSS's care than she was under respondents' care, but he never states how he and H.B.R. will address the emotional and physical welfare of F.L.R. Respondent also does not adequately address the trial court's concern that respondents have not made reasonable progress in the conditions that caused F.L.R. to be removed. Since two grounds for terminating parental rights were established by clear and convincing evidence, and since there is no evidence that the trial court's decision is not manifestly unsupported by reason,we find no error regarding the trial court's decision concerning the disposition of F.L.R.
III.
Finally, respondent J.R. argues that the trial court erred in not entering its order within the time required under N.C. Gen. Stat. § 7B-1109(e) (2003), which states:
The court shall take evidence, find the facts, and shall adjudicate the existence or nonexistence of any of the circumstances set forth in G.S. 7B-1111 which authorize the termination of parental rights of the respondent. The adjudicatory order shall be reduced to writing, signed, and entered no later than 30 days following the completion of the termination of parental rights hearing.
The same time period also applies to the disposition order, as set forth in N.C. Gen. Stat. § 7B-1110(a) (2003). Respondent J.R. asserts that the trial court violated this statute because hearings were held 2 and 21 April 2003, but the order, including both the adjudication and disposition, was not signed by the trial court until 28 July 2003 and was not entered until 15 August 2003. Each of these dates clearly exceed thirty days. Respondent relies on In re Alexander, which states that "shall" in N.C. Gen. Stat. § 7B-1102 establishes a mandate to the trial court, and he argues that the word "shall" in N.C.G.S. § 7B-1109(e) and § 7B-1110(a) establish similar mandates, and thus the trial court's order should be vacated because the trial court failed to comply with these mandates. See Alexander, 158 N.C. App. 522, 525, 581 S.E.2d 466, 468 (2003).
However, we addressed this same issue in In re J.L.K. and heldthat violating the thirty-day provision of N.C.G.S. § 7B-1109(e) does not mean that the order terminating parental rights should be vacated. J.L.K., ___ N.C. App. ___, ___, 598 S.E.2d 387, 390-91 (2004). We clarified that our holding in Alexander applied to N.C.G.S. § 7B-1106.1, which requires that a movant provide notice to the relevant parties for hearings on abuse, neglect, and dependency. J.L.K., ___ N.C. App. at ___, 598 S.E.2d at 390-91. In J.L.K., we reiterated that "'[t]he notice requirements at issue are part of a statutory framework intended to safeguard a parent's fundamental rights "to make decisions concerning the care, custody, and control of their children."'" Id. at ___, 598 S.E.2d at 391 (quoting Alexander, 158 N.C. App. at 525, 581 S.E.2d at 468 (quoting Troxel v. Granville, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000))). We also noted that among other differences, "section 7B-1109(e)'s 30-day provision [does not] implicate a fundamental right, unlike the notice requirement of section 7B-1106.1, the statute at issue in Alexander." J.L.K., ___ N.C. App. at ___, 598 S.E.2d at 391. Therefore, we concluded in J.L.K. that our decision in Alexander did not require us to vacate the order terminating parental rights in J.L.K. Id.
Furthermore, similar to the parent in J.L.K., respondent J.R. has failed to show how the delay in reducing the order to writing prejudiced him. J.L.K., ___ N.C. App. at ___, 598 S.E.2d at 391. This assignment of error is without merit.
Affirmed.
Chief Judge MARTIN and Judge WYNN concur. Report per Rule 30(e).