IN THE MATTER OF: JAMYA NESBITT

No. COA00-1168

(Filed 4 December 2001)

**Termination of Parental Rights— neglect—willfully leaving child in foster care**

The trial court abused its discretion by entering an order terminating the parental rights of respondent mother based on neglect and a violation of N.C.G.S. § 7B-1111(a)(2) (previously N.C.G.S. § 7A-289.32) regarding willfully leaving a child in foster care for more than twelve months without making reasonable progress, because: (1) many of the isolated incidents outlined in the trial court's findings were immediately corrected by the mother, and testimony of a psychotherapist, a clinical social worker, and a social worker supports a finding that reasonable progress was made by the mother; (2) on the issue of safety concerns, petitioner failed to meet its burden of demonstrating by clear, cogent, and convincing evidence the lack of reasonable progress by the mother to support grounds for termination of her parental rights; (3) on the issue of housing, the findings that the mother had made no progress in securing permanent stable housing are all based on events that occurred after the child had been removed from the home, and the trial court's own findings show that at the time of the hearing the mother had secured a new home and had been living in that home for almost a year; (4) on the issue of employment, the mother continues her efforts to secure employment, the mother is precluded from securing employment as an exotic dancer which provided a living for her family for many years, the mother sought work that would coincide with available hours that she could visit with her child, and the mother has maintained child support payments while her

**IN RE NESBITT**

[147 N.C. App. 349 (2001)]

child was in the custody of Youth and Family Services; (5) the mother was cooperative with the social workers, completed all required parenting classes and mental health therapy, and visited with her child at every possible chance; and (6) the decision of whether to terminate parental rights should not be relegated to a choice between the natural parent and the foster family, even if the foster family would best provide for the child's welfare, as long as the parent provides for the child adequately.

Appeal by respondent from judgment entered 22 March 2000 by Judge Elizabeth M. Currence in Mecklenburg County District Court. Heard in the Court of Appeals 23 May 2001.

*Alan B. Edmonds, for petitioner-appellee Mecklenburg County Youth & Family Services.*

*Rick Lail, for respondent-appellant Caroline Nesbitt.*

*Chiege Okwara, Child Advocate with Guardian Ad Litem.*

BIGGS, Judge.

On 22 March 2000, the trial court entered an order terminating the parental rights of Caroline and Jamey Nesbitt. Ms. Nesbitt gave notice of appeal in open court. Jamey Nesbitt did not contest the order and is not a party to this action. For the reasons that follow, we reverse the trial court's order terminating the parental rights of Caroline Nesbitt.

Jamya (Mimi) Nesbitt was born in Mecklenburg County on 30 July 1995, to Caroline and Jamey Nesbitt. Caroline and Jamey separated in 1996; since their separation, Jamey's whereabouts are unknown. Youth and Family Services (YFS) filed a juvenile petition to remove Mimi from Ms. Nesbitt's custody. The petition alleged that Ms. Nesbitt neglected Mimi by failing to provide proper care, supervision, and discipline. On 13 August 1997, YFS obtained a non-secure custody order and placed Mimi in foster care. On 11 September 1997, an adjudicatory hearing was held on the allegations in the petition. Mimi was adjudicated dependent; and, the portion of the petition alleging neglect was held in abeyance. Mimi has remained in the custody of YFS since her removal and has been with the same foster family the entire time. The foster family wishes to adopt Mimi.

In February 1999, the trial court, upon review of this matter, found that Ms. Nesbitt was not making reasonable progress toward

**IN RE NESBITT**

[147 N.C. App. 349 (2001)]

reunification and approved changing the goal of the case from reunification to termination of parental rights and adoption. On 5 May 1999, DSS filed a petition to terminate the parental rights of Ms. Nesbitt. Hearings on the petition were conducted on 7 December 1999, 11 February 2000, 9 March 2000 and 13 March 2000 before Judge Elizabeth M. Currence of Mecklenburg County District Court.

The trial court found that Ms. Nesbitt had willfully left Mimi in foster care for more than twelve (12) months without making reasonable progress toward correcting the conditions that led to Mimi's placement in foster care in violation of N.C.G.S. § 7B-1111(a)(2) (1999). At the final hearing on 13 March 2000, the court determined that termination of parental rights was in Mimi's best interest, and on 15 September 2000, filed an order terminating Ms. Nesbitt's parental rights.

---

Initially, we note that the North Carolina Juvenile Code, including the provisions governing proceedings to terminate parental rights, was revised effective 1 July 1999. This revision replaced various articles of Chapter 7A with new Chapter 7B. The petition in the instant case was filed on 5 May 1999, which was prior to the effective date of Chapter 7B; accordingly, this case is governed by the appropriate provisions of Chapter 7A.

We find that it was error for the trial court to rely on Chapter 7B as statutory authority for its decision. However, we find this error to be harmless in that there is no material difference in the pertinent portions of Chapter 7A which actually control in the instant case.

Termination of parental rights proceedings are conducted in two phases: adjudication and disposition. *See generally, In re Brim,* 139 N.C. App. 733, 535 S.E.2d 367 (2000); *In re Young,* 346 N.C. 244, 485 S.E.2d 612 (1997). During adjudication, the petitioner has the burden of proof to demonstrate by clear, cogent and convincing evidence that one or more of the statutory grounds for termination exist. *In re Nolen,* 117 N.C. App. 693, 453 S.E.2d 220 (1995); *In re Bluebird,* 105 N.C. App. 42, 411 S.E.2d 820 (1992). The standard of appellate review of the trial court's conclusion that grounds exist for termination of parental rights is whether the trial judge's findings of fact are supported by clear, cogent, and convincing evidence, and whether these findings support its conclusions of law. *In re Huff,* 140 N.C. App. 288, 536 S.E.2d 838 (2000), *disc. review denied,* 353 N.C. 374, ——, S.E.2d

—— (2001); *In re Allred*, 122 N.C. App. 561, 471 S.E.2d 84 (1996). The statutory grounds for termination are set forth in N.C.G.S. § 7A-289.32 (now N.C.G.S. § 7B-1111(a)).

If the petitioner meets its burden of proving that there are grounds to terminate parental rights, the trial court then moves to the dispositional phase and must consider whether termination is in the best interests of the child. *In re Brake*, 347 N.C. 339, 341, 493 S.E.2d 418, 420 (1997); *In re Shue*, 311 N.C. 586, 319 S.E.2d 567 (1984). The trial court does not automatically terminate parental rights in every case that presents statutory grounds to do so. *In re Leftwich*, 135 N.C. App. 67, 518 S.E.2d 799 (1999); *In re Allred*, 122 N.C. App. 561, 471 S.E.2d 84 (1996). The trial court has discretion, if it finds that at least one of the statutory grounds exists, to terminate parental rights upon a finding that it would be in the child's best interests. *In re Blackburn*, 142 N.C. App. 607, 543 S.E.2d 906 (2001); *In re McLemore*, 139 N.C. App 426, 533 S.E.2d 508 (2000). The trial court's decision to terminate parental rights is reviewed on an abuse of discretion standard. *In re Brim*, 139 N.C. App. 733, 535 S.E.2d 367 (2000); *In re Allred*, 122 N.C. App. 561, 471 S.E.2d 84 (1996).

---

Caroline Nesbitt contends that the trial court erred by finding as fact and concluding as a matter of law that grounds exist to terminate her parental rights under N.C.G.S. § 7B-1111(a)(2). We agree.

The trial court based its order of termination on four grounds; however, the court found that, while all four grounds apply to the father, only one of the grounds set forth applied to Ms. Nesbitt. The court concluded that Caroline Nesbitt had "willfully left Jamya Nesbitt in foster care for more than twelve (12) months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting the conditions which lead to removal in violation of N.C.G.S. § 7B-1111(a)(2)." Further, the court found that it "was in the best interest of Jamya Nesbitt that Ms. Nesbitt's parental rights be terminated."

It is undisputed that Mimi has been in foster care over twelve months. At the time of the termination proceeding, she had been in foster care for twenty-seven (27) months. Thus, this Court must determine whether there is clear, cogent and convincing evidence to support the trial court's finding that Ms. Nesbitt failed to make reasonable progress in correcting the conditions which led to Mimi's removal and further, that such failure was willful.

We first note that it is unclear from the record what specific conditions existed at the time of Mimi's removal which were to be corrected before she could be returned to Ms. Nesbitt's custody. This is due in large part to the failure to include in the record a number of critical documents such as the order adjudicating Mimi dependent. The record does indicate, however, that the major concern expressed by YFS at the time of removal was related to Mimi's safety. The exact safety issue is not apparent from the record. Further, it would appear that it was not until the case plan changed from reunification to termination, that additional concerns were expressed concerning housing and employment. The record does suggest that the areas upon which the trial court evaluated Ms. Nesbitt's progress in the order terminating her parental rights were safety concerns and parenting skills, housing and employment.

The trial court made the following findings to support its conclusion that Ms. Nesbitt had not made reasonable progress related to safety issues and parenting skills:

. . . .

6. The visits had to be supervised largely due to safety concerns, i.e., Caroline Nesbitt was unable to establish boundaries which would allow the child to visit with her unsupervised.

7. Specific examples of the mother's lack of awareness of boundaries included not holding the child's hand when crossing the street, and having a lit candle on the floor at a home visit. When these occurred, the child was only two years old. Caroline Nesbitt did not seem to understand a two-year-old could not be trusted to use correct judgment in every situation.

8. Even after being advised, Ms. Nesbitt had the lit candle on her floor at the next visit. Ms. Nesbitt responded she always lights candles and Jamya knew not to go near them. The mother also allowed the child to run around near a floor fan with a rotating blade. The mother had an unrestrained, medium-sized dog at some of the visits.

. . . .

10. Also, Ms. Nesbitt talked to Jamya about adult emotional issues as if she were an adult. When the mother would discuss her personal life and problems such as housing and employment, Jamya would cry because she did not understand what her mother was saying.

. . . .

12. Mr. Bullard [the YFS social worker] had to address at least one of the above outlined problems each visit.

13. The mother also demonstrated inappropriate conduct by jumping off the steps (a vertical distance of 4 to 5 feet) at the Arosa House, the child's placement, in front of Jamya. Another time, Ms. Nesbitt jumped over a fence during a visit. Jamya was unable to follow her. Arosa House staff were concerned Jamya could get hurt if she imitated her mother.

14. During the time Derrick Bullard supervised the visits, the mother was never able to graduate to unsupervised visits as she was unable to consistently maintain age appropriate boundaries and deal with Jamya's tantrums adequately. There also continued to be some safety concerns.

. . . .

18. During the time Ms. Tamikia Scott supervised the visits, the mother was never able to have an unsupervised visit with the child. On the client/parent interactions report, the mother always had many blocks checked in the fair and poor category. Specific examples of the safety prompts given by Ms. Scott and the circumstances which led to the safety prompts include:

> a. On May 10, 1999, Caroline and Jamya Nesbitt were playing in the park and Caroline continued to talk to another parent about her pregnancy while Mimi was climbing up the sliding board the wrong way. When Mimi reached the top of the slide, she called for her mother to look out for her. Ms. Nesbitt had to be prompted to maintain her level of supervision of the child and not put her primary focus on external factors around her.

> b. On June 7, 1999, Ms. Nesbitt had to be prompted twice to stay focused on Mimi during the visit and not on the Family Center staff.

> c. On June 14, 1999, Ms. Nesbitt allowed Mimi to stand on the edge of a brick wall surrounding a pond while she was looking at ducks swimming in the pond. Mimi was leaning over the edge to watch the ducks and Ms. Nesbitt walked back to a bench and sat down. Family Center staff removed Mimi from the edge and counseled her and her mother on this safety risk.

d. On June 21, 1999, Family Center staff counseled the mother the week before on safety risks in her home. When Mimi was brought to visit, there was an exposed light bulb burning on the floor of the house. The mother could have provided light to the room where the visit was occurring by opening a blind, but did not do so neither did she follow a suggestions [sic] made a week earlier to buy a lampshade for the lamp to cover the exposed light bulb.

e. On July 26, 1999, Family Center staff gave Ms. Nesbitt a safety prompt for leaving Mimi unattended at a Chuckie Cheese restaurant while Ms. Nesbitt was ordering a pizza.

The safety prompts continued after Ms. Scott stopped supervising the visits, however, the frequency of safety prompts declined. Ms. Scott noted in her February 2000 report the mother's ability to incorporate new knowledge about child development has been limited [sic]. The [c]ourt finds from the evidence this problem is significant because she is unable to apply the things she learns, consistently, especially the instruction she has received regarding child safety.

While we do conclude that there is evidence in the record to support these findings; we hold that this evidence does not rise to the level of clear, cogent and convincing evidence of grounds for termination of parental rights.

"Clear, cogent and convincing describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt." *The N.C. State Bar v. Harris*, 137 N.C. App. 207, 218, 527 S.E.2d 728, 735 (2000) (quoting *N.C. State Bar v. Sheffield*, 73 N.C. App. 349, 354, 326 S.E.2d 320, 323 (1985)). And it "has been defined as evidence which should fully convince." *Id.* This Court has required strong evidence to support termination. *See Alleghany County Dept. of Social Services v. Reber*, 75 N.C. App. 467, 331 S.E.2d 256, 258 (1985) (held that case law requires stronger evidence to terminate parental rights); *In re Adcock*, 69 N.C. App. 222, 227, 316 S.E.2d 347, 350 (1984) (court found the totality of evidence to support termination was plenary, clear, cogent and convincing); *In re Moore*, 306 N.C. 394, 405, 293 S.E.2d 127, 133 (1982) (grounds exist where there was no evidence to the contrary); *In re Biggers*, 50 N.C. App. 332, 343, 274 S.E.2d 236, 243 (1981) (court found "overwhelming and uncontradicted evidence to support termination"). As in *Reber*,

we conclude that the evidence in this case is "neither plenary, nor overwhelming, nor uncontradicted."

Moreover, there is substantial evidence in the record that demonstrates that many of the isolated incidents outlined in the court's findings were immediately corrected by Ms. Nesbitt. With regards to a lit candle on the floor, Mr. Bullard testified to the following:

Q: Did Ms. Nesbitt appear to recognize . . . and remove [the] potential hazard or risk?

A: . . . [Y]es, sir.

*******

With regards to a floor fan and medium size dog, Mr. Bullard testified to the following:

A: There was the situation with the floor fan, a situation with a medium dog. . . .

Q: So was the dog problem remedied? Was the dog either removed—

A: It was remedied, yes, sir.

Q: Was the fan remedied?

A: Yes, sir.

In addition, the following testimony of Lynn Yarborough, a psychotherapist; Elaine Yates, a clinical social worker at the Family Center; and Tamikia Scott, a social worker with YFS, support a finding that reasonable progress was made by Ms. Nesbitt.

Ms. Yarborough began working with Ms. Nesbitt in October 1997, following Ms. Nesbitt's court ordered mental health evaluation. Ms. Yarborough testified that she did incorporate safety concerns in Ms. Nesbitt's therapy in June 1998. In an effort to help Ms. Nesbitt deal with the safety issues presented by YFS, Ms. Yarborough referred Ms. Nesbitt to a coping skills group. Ms. Nesbitt completed sessions with the coping skills group. Ms. Yarborough stated that Ms. Nesbitt kept virtually all of her appointments and has continued to meet with Ms. Yarborough.

Ms. Yates testified that from her observation of Ms. Nesbitt and Mimi, there was not a reason for restrictive visitation. She testified that Ms. Nesbitt selected appropriate TV shows and provided toys

IN RE NESBITT

[147 N.C. App. 349 (2001)]

and "physical safety." Ms. Yates also noted, for the court, a series of visits documenting Ms. Nesbitt's significant attempts to recognize and improve her reactions to Mimi:

> "[December 20th], [Ms. Nesbitt] appropriate [] TV shows, did a drawing exercise [with Mimi]."

> "January 31st, there were no prompts. . . ."

> "February 7th, . . .[Ms. Nesbitt] arrived an hour and a half early. She provided adequate parenting regarding safety issues. There were no prompts. . . ."

> "February 14th . . . [Ms. Nesbitt] was exceptionally appropriate and very trustful of me in dealing therapeutically with [Mimi's] regressions. She provided affection as I instructed her to and she did a real good job."

> "February 21st, no prompts . . . ."

While Ms. Yates stated that "[Ms. Nesbitt's] ability to incorporate new knowledge about child development has been limited", she further explained that this was due to "strongly-held beliefs about normal development" which are often attributed to personal childhood experiences. Ms. Yates explained an observation where Ms. Nesbitt expected Mimi to reminisce at an adult level of maturity while they "went through old clothes". Ms. Yates stated, that while she had to explain that children have different reactions, she did not find the interaction damaging. Rather, she stated, "I think actually it was quite helpful."

Finally, though the court found that Ms. Nesbitt was never able to have unsupervised visits with Mimi while Tamikia Scott supervised the visits, Ms. Scott testified that the frequency of the safety prompts decreased. Further, she testified:

> that Ms. Nesbitt "had improved some from the last visits we had. . . . Puts child well-being first. That was a major issue in the beginning. Safety, she had improved some on that one. Keeping [Mimi] safe in visit [sic], she had improved some on that one."

This Court is not at all persuaded by the numerous references to so called "safety prompts," particularly to matters as trivial as whether the mother used a lamp without a shade for lighting rather than opening the blinds; allowing a child to climb a slide the wrong way; or having a medium-sized dog. Even finding, as we do, that each of the

incidents set forth in the court's findings are supported by evidence, we conclude that these incidents, even considered cumulatively, do not support grounds for termination of parental rights. Accordingly, on the issue of the safety concerns, we conclude that the petitioner failed to meet its burden of demonstrating by clear, cogent and convincing evidence the lack of reasonable progress by Ms. Nesbitt to support grounds for termination of her parental rights.

The second area of concern upon which the trial court evaluated Ms. Nesbitt's progress was housing. The court made the following findings:

. . . .

22. When Julie Crapster became her social worker in June 1998, Ms. Nesbitt was living in an apartment on East 36th Street in Charlotte. However, the mother was evicted from that apartment in January, 1999. During the remainder of the time Julie Crapster was the worker on the case, the mother was unable to establish regular housing.

23. Immediately after being evicted, the mother lived in a hotel room for two weeks which her employer, Bally's Fitness, helped her secure. The mother was supposed to be saving money during this time.

24. On 8 January 1999, the mother met a man at a bus station who had just gotten out of prison and needed a roommate. Ms. Nesbitt discussed moving in with him. Julie Crapster encouraged her to go to the homeless shelter instead to save money.

25. On 20 January, the mother reported that she had moved in with the man she met at the bus station.

26. When Julie Crapster ceased being the worker on the case in March, 1999, Ms. Nesbitt was either living at the shelter or with the man she met at the bus station.

The court concluded that Ms. Nesbitt had made no progress in securing permanent stable housing. We first note that these findings related to housing are all based on events that occurred after Mimi had been removed from the home. Further, the court's own findings show that at the time of the hearing, Ms. Nesbitt had secured a new home and according to testimony from a social worker had been living in that home for almost a year. On cross-examination, Ms. Carrie Trammell, social worker, testified that Ms. Nesbitt's home was not "dirty—things weren't broken. . . ." She acknowledged that the apart-

ment was "reasonably well-kept". The trial court, however, expressed concern that Ms. Nesbitt had paid the last two months rent with money from her income tax returns but failed to provide a plan for paying future rent. While we acknowledge this as a legitimate concern, we also recognize that making ends meet from month to month is not unusual for many families particularly those who live in poverty. However, we do not find this a legitimate basis upon which to terminate parental rights. We again conclude that the petitioner has failed to meet its burden of demonstrating by clear, cogent and convincing evidence the absence of reasonable progress related to housing to support termination of Ms. Nesbitt's parental rights.

The third concern, upon which the court evaluated Ms. Nesbitt, was employment. On this particular issue, the court made the following findings:

84. Some time in 1993, the couple moved to Charlotte. In October, 1993, Ms. Nesbitt began to work as an exotic dancer, which she did for four years.

85. During the time she was an exotic dancer, she averaged making $1,000 a week.

86. At the time she became pregnant with Jamya, she stopped dancing temporarily and received Aid to Families with Dependent Children.

. . . .

89. She continued working as an exotic dancer until February 1998. The mother was arrested for lewd and indecent conduct while dancing and, as a result, was fired from her employment at Leather & Lace South.

90. As part of an agreement with the District Attorney's office to have those charges dismissed, she agreed not to seek employment as an exotic dancer.

91. Caroline Nesbitt related many, many different jobs she had held since moving to Charlotte.

92. The most recent job was from May, 1999 through December, 1999 when she worked at Burger King. She was discharged from there in early December 1999.

Though the court's findings do indicate that Ms. Nesbitt has had approximately seven jobs since Mimi was removed, we are impressed

**IN RE NESBITT**

[147 N.C. App. 349 (2001)]

with the mother's continued efforts to secure employment. We further note that by agreement with the District Attorney's office, she is precluded from securing employment as an exotic dancer, employment that had provided a living for her family for many years. Moreover, we are impressed with the testimony that she sought work that would "coincide with available hours that she could visit with her daughter." Finally, the record shows that in spite of her troubled work history, Ms. Nesbitt has maintained child support payments while Mimi was in the custody of YFS and has maintained a home for almost a year.

Even, assuming *arguendo*, that the court's finding of failure to make reasonable progress was supported by clear, cogent and convincing evidence, in order to uphold the trial court's order, we must find that Ms. Nesbitt's failure was willful. *In re Bishop*, 92 N.C. App. 662, 375 S.E.2d 676 (1989). Willfulness is established when the respondent had the ability to show reasonable progress, but was unwilling to make the effort. *See Nolen*, 117 N.C. App. 693, 453 S.E.2d 220 (1995) (parent's refusal to obtain treatment for alcoholism constituted willful failure to correct conditions that had led to removal of child from home); *In re Bluebird*, 105 N.C. App. 42, 411 S.E.2d 820 (1992) (general lack of involvement with child over two year period supports finding that respondent willfully left child in foster care). In *In re Bishop*, 92 N.C. App. 662, 375 S.E.2d 676 (1989), the court found "willfulness" where respondent initially participated in programs designed to improve her circumstances, but later "largely abandoned these efforts"; her visits with her daughter were "infrequent"; and the social worker had a difficult time reaching her. *Id.* at 669, 375 S.E.2d at 681.

Here, we find that Ms. Nesbitt was cooperative with the social workers, completed all required parenting classes, mental health therapy, and visited with Mimi at every possible chance. Mr. Bullard testified that Ms. Nesbitt was "extremely cooperative, arrive[d] on time and actually early, prepared to visit for each visit, was very receptive to any feedback I gave her and was not defensive, [but, instead] cooperative." He also confirmed that "Mimi was excited to see mommy. . . ." Mimi and Ms. Nesbitt were "very affectionate towards each other." Ms. Julie Crapster testified that Ms. Nesbitt completed the mental health evaluation as ordered by the court and maintained current child support payments.

Finally, we are troubled by the numerous findings made by the trial court regarding the foster parents. The decision of whether to

**IN RE NESBITT**

[147 N.C. App. 349 (2001)]

terminate parental rights should not be relegated to a choice between the natural parent and the foster family. Our Supreme Court has held that "even if it were shown, . . . that a particular couple desirous of adopting a child would *best* provide for the child's welfare, the child would nonetheless not be removed from the custody of its parents so long as they were providing for the child *adequately. Petersen v. Rogers*, 337 N.C. 397, 401, 445 S.E.2d 901, 904 (1994) (emphasis added). This was not a choice between Ms. Nesbitt and the foster parents. Rather, an independent decision of Ms. Nesbitt's fitness to parent should be made, and only if she is found to be either unwilling or unable to parent her child should the foster home then be considered under the best interests standard.

We conclude that this record fails to demonstrate clear, cogent and convincing evidence that Ms. Nesbitt willfully left her child in foster care without making reasonable progress. Accordingly, we do not reach review of the court's conclusion that it was in the best interest of the child to terminate Ms. Nesbitt's parental rights.

While we recognize that the trial court is perhaps in the best position to evaluate the evidence in these very sensitive cases and are mindful of the need for permanency for young children; we believe that the law requires compelling evidence to terminate parental rights. The permanent removal of a child from its natural parent requires the highest level of scrutiny and should only occur where there is compelling evidence of potential risk of harm to the child or their well being. This Court would not hesitate to support the drastic judicial remedy of termination of parental rights if it was clear from the record that grounds exist to do so. This record fails to support such grounds.

Accordingly, we reverse and vacate the trial court's order terminating parental rights.

Reversed and vacated.

Judges WYNN and CAMPBELL concur.