IN RE: D.H., C.H., J.H., E.H.
No. COA08-667
Court of Appeals of North Carolina
Filed October 21, 2008
This case not for publication
Robert A. Lester, for petitioner-appellee Rowan County Department of Social Services.
Jon W. Myers, for respondent-appellant mother.
David A. Perez, for respondent-appellant father.
Pamela Newell Williams, for guardian ad litem.
STEELMAN, Judge.
The trial court's findings of fact were supported by clear, cogent and convincing evidence that supported its conclusion that grounds existed to terminate father's parental rights to these four juveniles. The trial court did not abuse its discretion in determining that termination was in the juveniles' best interests.

I. Factual and Procedural Background
The Rowan County Department of Social Services ("DSS") has been involved with respondents' family since 1998. DSS's involvement with the family continued in 2004 and 2005 following substantiated reports of domestic violence and substance abuse. On 1 March 2006, a DSS social worker received a call regarding a domestic dispute at respondents' home. When the social worker arrived at respondents' home, she found the home to be in "complete disarray with beer cans in the kitchen/living room area, trash to include an old pizza box stuffed with trash and food about the home." Additionally, respondents had "three small pigs, several dogs, a bird and a cat living in the home." The social worker observed "animal feces throughout the home." Moreover, the juveniles were found sleeping on a pallet on the floor.
Father reported to the social worker that mother was "harassing him for prescription medication and had locked him out of the home." The social worker observed bruises and scratches on mother's arm. Mother told the social worker that father had been "slamming her arm in the door in an attempt to get her to give him his keys and cell phone." Mother claimed that she and the juveniles slept in a locked bedroom because "drug addicts and drug dealers come in and out of her home, and she does not feel safe." The children were placed with the maternal grandmother for the night.
Father and mother met with the social worker the next day. The social worker requested that they both take a drug screen. On the way to the screening, father "ripped up the drug screen voucher and jumped out of his car. . . ." He then returned and informed the social worker that the children and the maternal grandmother were on their way to Tennessee. The social worker received a call from the maternal grandmother, who was in Boone, North Carolina. Grandmother told the social worker that father had given her $200.00 to take the children to Tennessee and planned to meet them there. She agreed to return the juveniles to the social worker. On 3 March 2006, DSS filed a petition alleging that D.H., C.H., J.H., and E.H. were neglected juveniles. DSS assumed custody of the children under a non-secure custody order.
On 2 June 2006, the juveniles were adjudicated neglected by consent order and custody was continued with DSS. The court ordered that father: (1) obtain a substance abuse evaluation and comply with all recommendations; (2) complete parenting classes; (3) submit to professional counseling to address his parenting skills and his enabling of mother's substance abuse; (4) attend counseling with the children as deemed appropriate by the children's therapist; (5) maintain a safe and clean home environment, free of illegal controlled substances; (6) submit to random drug screens; and (7) address domestic violence issues in group therapy. Additionally, the court ordered that mother: (1) obtain a substance abuse evaluation and comply with all recommendations; (2) complete parenting classes; (3) receive counseling as appropriate; (4) attend counseling with the children as deemed appropriate by the children's therapist; (5) obtain and maintain stable housing and employment, should she not reconcile with father; (6) submit to random drug screens; and (7) address domestic violence issues in group therapy.
A permanency planning review hearing was held on 13 July 2006. The trial court found that mother had refused to cooperate with DSS and had made "little progress" towards reunification efforts. Accordingly, the court authorized DSS to cease reunification efforts with mother.
On 25 and 26 January 2007, the trial court held another permanency planning review hearing. The trial court made findings regarding a trial placement of the children with father that began on 24 August 2006, and ended on 2 November 2006. The court found as fact that during the trial period, father "did not consistently keep a safe and clean home. . . ." DSS received reports of drug use in the home, further instances of domestic violence, and of the home being "dirty and messy." When DSS arranged for in-home aide services, father missed appointments. When a note was left for father informing him that he was "non-compliant" with services, he responded with an "angry and belligerent" message. The children were missing school unnecessarily. On 20 October 2006, during an unannounced visit, DSS observed father and a female guest in an impaired condition. DSS visited the home again on 27 October 2006 and found the home in "disarray." On 2 November 2006, DSS arrived at the home with law enforcement to end the trial placement. Father locked the door and refused entry into the home. Eventually he allowed entry to the DSS workers.
Another review hearing was held on 26 April 2007. The trial court found that father had tested positive for cocaine on several occasions. Father had also failed to attend all of his twelve-step and domestic violence support group meetings. The court also made findings concerning father and mother's turbulent home life, including continuing substance abuse and domestic violence. The court concluded that father and mother were unable to achieve a safe, permanent home for the children within a reasonable time. Accordingly, the trial court changed the permanent plan for the children to adoption.
On 21 June 2007, DSS filed a petition to terminate father's and mother's parental rights. DSS alleged that they had neglected the juveniles within the meaning of N.C. Gen. Stat. § 7B-101(15), and that the probability that neglect would be repeated was "very high." DSS further alleged that the juveniles had been placed in the custody of DSS and that mother, for a continuous period of six months immediately preceding the filing of the petition, had failed to pay a reasonable portion of the cost of care for the juveniles although physically and financially able to do so, pursuant to N.C. Gen. Stat. § 7B-1111(a)(3).
Hearings were held on the termination petition on 1 November 2007, 19 November 2007, 20 December 2007, and 24 January 2008. The trial court concluded that grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) to terminate both father's and mother's parental rights, and grounds existed pursuant to N.C. Gen. Stat. § 7B-1111(a)(3) to terminate mother's parental rights. The court further concluded that it was in the juveniles' best interests that both father's and mother's parental rights be terminated. Father and mother appeal.

III. Analysis

A. N.C. Gen. Stat. § 7B-1111(a)(1)
In his first argument, father contends that the trial court's conclusion that there were statutory grounds to terminate his parental rights pursuant to N.C. Gen. Stat. § 7B-1111(a)(1) was unsupported by competent evidence in the record. We disagree.
N.C. Gen. Stat. § 7B-1111 sets out the statutory grounds for terminating parental rights. A finding of any one of the separately enumerated grounds is sufficient to support a termination. In re Taylor, 97 N.C. App. 57, 64, 387 S.E.2d 230, 233-34 (1990). The court may terminate the parental rights upon a finding that the parent has abused or neglected the juvenile as defined by Chapter 7B of the North Carolina General Statutes. N.C. Gen. Stat. § 7B-1111(a)(1)(2007). The trial court concluded D.H., C.H., J.H., and E.H. were neglected juveniles. "Neglected juvenile" is defined in N.C. Gen. Stat. § 7B-101(15) as:
A juvenile who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.
N.C. Gen. Stat. § 7B-101(15). "The standard of appellate review is whether the trial court's findings of fact are supported by clear, cogent, and convincing evidence and whether the findings of fact support the conclusions of law." In re D.J.D., 171 N.C. App. 230, 238, 615 S.E.2d 26, 32 (2005) (citing In re Huff, 140 N.C. App. 288, 291, 536 S.E.2d 838, 840 (2000), disc. review denied, 353 N.C. 374, 547 S.E.2d 9, 10 (2001)).

1. Challenged Findings of Fact
Father challenges findings of fact 13 and 16 as unsupported by clear, cogent and convincing evidence. The challenged portions of finding of fact 13 read:
[R]espondents have neglected the juveniles, continue to neglect the juveniles, and the probability of the repetition of neglect . . . is very high. . . . [E]vidence presented to the court establishes this ground for termination as described below:
. . .
b. [Father] . . . agreed and the court ordered [him] to complete substance abuse evaluations and to follow recommendations of the assessments, to complete parenting classes, to receive counseling, to attend counseling with the children as appropriate, to maintain safe, clean homes free of illegal drugs, to submit to random drug screens as requested, and to address domestic violence issues. [Father] ha[s] not satisfied the requirements of the court, although over twenty-two months have now passed since the juveniles were taken into nonsecure custody.
c. [Father] has [not] remained free of illegal drugs during the time that the children have been in nonsecure custody. Although drug abuse did not appear to be a problem for [him] when the children first came into nonsecure custody, [father] began to test positive for illegal controlled substances in the beginning of 2007. [Father] tested positive for cocaine on January 5, 2007, March 5, 2007, and April 4, 2007. He tested positive for cocaine and opiates on April 16, 2007. He tested positive for benzodiazepines, morphine, and methadone on August 27, 2007. [He] completed drug treatment recommended by Alternatives Counseling, Inc. on June 20, 2007. Alternatives recommended that [father] continue to attend Narcotics Anonymous groups. [Father] never provided documentation to Social Worker Wright that he attended NA groups. [Father] admits that he continues to "lock up" his prescription medication so that [mother] will not have access to them. When asked by Social Worker Wright why he began to abuse drugs when drugs were not a problem for him early in the case he responded that he couldn't beat it, so he joined [mother]. . . .
d. [Respondents] continue to have unresolved domestic violence issues between them. Since March 2, 2006 [mother] has indicated to Social Worker Wright and others on numerous occasions that [father] has physically abused her. On November 30, 2006, Social Worker Wright observed [mother] at Day mark with bruises on her head, arms, and legs. When asked about the marks, [mother] responded, "You know what happened." [Mother] went on to explain that [father] was angry that Social Worker Wright had recently been out to the home and had taken his anger out on [her]. On December 31, 2006 [mother] reported to the hospital in Iredell County. She called Social Worker Wright from the hospital, indicating that [father] had assaulted her again and that she was afraid of him. In April of 2007 police responded to a domestic call at [father's] residence. [Mother] had indicated to law enforcement that [father] had hit her in the throat with toothpaste. [Father] was observed by law enforcement to be impaired. [Mother] told law enforcement that [father] sold pills from the residence and drove without insurance. On July 13, 2007 law enforcement responded to another domestic violence call at [father's] residence. [Mother] reported that [father] had slapped her in the face and had cut her hair. [Mother] was impaired and had a lock of hair in her hand. She told law enforcement that she was afraid of [father] and wanted him to be arrested. [Respondents] argued in front of law enforcement about whether or not [mother] lived at the residence. During the weekend of October 26, 2007 [father] called 911 to report that [mother] was threatening suicide. [Mother] denied a suicidal threat. On November 2, 2007 and into the morning of November 3, 2007 [father] again called 911 indicating that [mother] was threatening to kill herself. Law enforcement arrived and found a large amount of blood in the home and on [mother], but none on [father]. [Mother] maintains through testimony that she was not truthful when she complained of [father] battering her. She maintains that if [father] refused to give her pills she would call law enforcement and make false accusations against him. . . . Whether or not [father] has assaulted [mother] in the past, their relationship has been and continues to be unpredictable, dysfunctional, and unhealthy. Raising children in such a volatile, unstable environment is not in the best interests of the children.
e. Neither respondent has completed domestic violence treatment as ordered by the court. [Father] was specifically ordered . . . to complete an intensive domestic violence program for batterers. [Father] was referred to Genesis, A New Beginning, in Cabarrus County. He completed an assessment on April 3, 2007 but attended only five groups. He did not appear for eight groups at all, and cancelled on two other occasions. The abuser treatment program requires that he complete all groups within thirty weeks. [Father] was re-evaluated to begin his groups again on October 22, 2007 and attended his first group on October 30, 2007, two days before the first day of trial in this TPR hearing. During the evaluation process. . ., [father] blamed others, including [DSS], for his problems. He reported that he gave pills to his wife to prevent fights and admitted to verbal and physical abuse between himself and [mother]. He acknowledged being an enabler of his wife's drug abuse and admitted that his actions had affected his family. [Father] minimized his own drug problem, admitting . . . only to using cocaine on one occasion for toothache pain. . . .
f. [Respondents] have serious trust and honesty issues, a constant theme and hindrance to progress throughout this case. [Father] was given the opportunity to have a trial placement with the children from August 24, 2006 until November 2, 2006. Since [mother] was not attending court during the time leading up to the trial placement, was not in contact with [DSS], was not completing any of the court's orders, and was not actively in drug treatment, the court ordered as a condition of the trial placement that [father] not allow [mother] to be in the family home or to have any contact with the children. [DSS] began to receive information that [mother] was having unauthorized contact with the children. [Father] eventually admitted that he was allowing [mother] to be in the home and to have contact with the children, although each time he spoke about the contact he changed his story regarding how frequently [mother] was in the home. [Father] was dishonest . . . about his drug use. He and [mother] have disagreed throughout the history of this case and before about whether or not [mother] lives in the residence. . . . [DSS] has never known for sure the address of [mother]. [Respondents] have been home on occasions when Social Worker Wright would attempt to visit the home but have refused to answer the door. . . .
g. The juveniles have been in the nonsecure custody of [DSS] for nearly two years at this time, and the respondents are not in any better position today than they were in March 2006 to parent the children. It is not likely that the children would be able to return home within six months.
Father contends that the evidence showed that he completed parenting classes as required by DSS; he completed substance abuse treatment per the recommendations of his assessment; he was not requested to participate in the children's counseling; his home was clean, safe and drug free at the time of the termination hearings; he was no longer enabling mother in her drug use; he was making significant progress towards the domestic violence concerns; and his failure to complete the domestic violence sessions earlier was due to circumstances beyond his control. He further asserts that there was no competent evidence to show that he was using drugs or allowing others to use drugs in his home at the time of those hearings.
Having reviewed the record, including mother's testimony and the testimony of law enforcement officers and social workers, we conclude that the above findings are each supported by clear, cogent and convincing evidence. To the extent that there were inconsistencies in the testimony, or that different inferences arose from the evidence, it was the role of the trial court to resolve those differences. See In re Whisnant, 71 N.C. App. 439, 441, 322 S.E.2d 434, 435 (1984) (it is the trial judge's duty to "weigh and consider all competent evidence, and pass upon the credibility of the witnesses, the weight to be given their testimony and the reasonable inferences to be drawn therefrom"). Finding of fact 13, discussed supra, in turn supports finding of fact 16, where the court found that "Statutory grounds exist for terminating [father's] parental rights . . . as to all four juveniles, namely N.C.G.S. 7B-1111(a)(1)." We hold that findings of fact 13 and 16 are supported by clear, cogent and convincing evidence. D.J.D., 171 N.C. App. at 238, 615 S.E.2d at 32.

2. Challenged Conclusions of Law
In the remainder of his argument, father contends that the trial court erred in terminating his parental rights because the neglect was not continuing at the time of the termination hearing. He also challenges the trial court's conclusion regarding probability of repetition of earlier neglect.
A parent's failure to make progress towards reunification is some evidence of continued neglect. See In re C.M., 183 N.C. App. 398, 644 S.E.2d 630 (2007) (affirming termination where there was evidence that the parent failed to show an ability to properly parent the children by using the skills that had been taught in the various programs that the parent attended); In re Brim, 139 N.C. App. 733, 535 S.E.2d 367 (2000) (affirming termination where respondent was not able to demonstrate that she could adequately provide for her child's needs, even after nearly two years of "diligent efforts" by DSS). The trial court found that father tested positive for illegal substances on 27 August 2007, two months after completing substance abuse treatment and four months after the court changed the permanent plan to adoption. The trial court further found that father twice called police in the two months preceding the termination hearings to report that mother was threatening suicide:
During the weekend of October 26, 2007 [father] called 911 to report that [mother] was threatening suicide. [Mother] denied a suicidal threat. On November 2, 2007 and into the morning of November 3, 2007 [father] again called 911 indicating that [mother] was threatening to kill herself. Law enforcement arrived and found a large amount of blood in the home and on [mother] but none on [father].
Father's contention that he was making significant progress towards resolving domestic violence concerns ignores the detrimental impact of episodes such as this one that created an environment injurious to children.[1] We hold that the trial court's detailed findings of fact amply support its conclusions that the juveniles were neglected, that father neglected the juveniles, and that there was a "very high" probability that father's neglect would be repeated. Accordingly, we hold that sufficient grounds existed for termination of father's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1).

B. Best Interests Analysis
In father's second argument, and mother's sole argument, respondents contend that the trial court abused its discretion in concluding that it was in the best interests of the juveniles to terminate their parental rights. We disagree.
Mother contends that she was making progress and there was a reasonable hope that the family could be reunified. She further contends that the trial court failed to consider the likelihood that J.H. would be adopted. Father disputes the "adoptability" of J.H., noting that J.H. and C.H. were no longer in a viable adoptive placement. Father argues that termination of his parental rights was an "unnecessary severance" which did not achieve the best interests of the children, particularly J.H. and C.H.
"The trial court has discretion, if it finds that at least one of the statutory grounds exists, to terminate parental rights upon a finding that it would be in the [juvenile's] best interests." In re Nesbitt, 147 N.C. App. 349, 352, 555 S.E.2d 659, 662 (2001). Factors to consider in determining the juvenile's best interests include: (1) the age of the juvenile; (2) the likelihood of adoption; (3) the impact on the accomplishment of the permanent plan; (4) the bond between the juvenile and the parent; (5) the relationship between the juvenile and a proposed adoptive parent or other permanent placement; and (6) any other relevant consideration. N.C. Gen. Stat. § 7B-1110(a)(2007). The court is to take action "which is in the best interests of the juvenile" when "the interests of the juvenile and those of the juvenile's parents or other persons are in conflict." N.C. Gen. Stat. § 7B-1100(3)(2005). The determination that termination of a parent's rights is in the child's best interest is a discretionary one, and the ruling will not be disturbed on appeal unless it "is so arbitrary that it could not have been the result of a reasoned decision." In re J.B., 172 N.C. App. 747, 751, 616 S.E.2d 385, 387, aff'd, 360 N.C. 165, 622 S.E.2d 495 (2005) (citations and internal quotations omitted).
In the instant case, the trial court's detailed findings of fact reveal that the trial court considered the factors required by N.C. Gen. Stat. § 7B-1110(a). The trial court made specific findings regarding the age of each child. Additionally, the trial court found that:
1. The juveniles are doing well in their foster care placements. . . .
2. D.[H.] has been in the care of the [] foster family since November 2, 2006, approximately fourteen months. D.[H.] is [] years old and has her ups and downs in the foster home, but she is happy and has learned how to become a child. She has learned to play, as opposed to acting like an adult as she did when she first began to live with the [foster family]. She is now able to focus on normal childhood activities such as soccer, cheer leading, girl scouts, softball, camping, and hiking. D.[H.] is able to visit with her siblings regularly. She has a hard time coping and readjusting after having contact with her biological parents. . . . After visits and phone calls she is irritable and withdrawn for a while. D.[H.] is in counseling. . . .
3. The [foster family] and D.[H.] are very bonded. The [foster family is] interested in adopting D.[H.] They love her and wish to provide a permanent home for her.
4. [Ms.] K. is the foster parent for C.[H.], J.[H.], and E.[H.] She is very interested in adopting E.[H.] She loves all three children and feels very bonded to them, but C.[H.] and J.[H.] have very high needs that Ms. K. does not feel she can meet long-term.
. . .
6. Terminating the parental rights of the respondents is necessary to accomplish the best permanent plan for the juveniles which is adoption.
7. [D.H.'s foster family is] able and willing to provide a permanent home for D.[H.] and [Ms.] K. is able and willing to provide a permanent home for E.[H.] Terminating the parental rights of the respondents as to C.[H.] and J.[H.] as early as possible will enable the juveniles the best chance possible to be placed in an adoptive home as soon as possible.
From these findings, it is clear that the trial court considered the likelihood of adoption and whether the termination of parental rights would aid in achieving the permanent plan of adoption. We find respondents' argument that the lack of an adoptive placement is a bar to termination to be unavailing. The record is replete with evidence that the children suffered severely from their upbringing with their parents and further trauma from the trial placement returning them to father's home. Such evidence is properly considered in evaluating the bond between the child and the parent, which is another factor to be considered by the court. N.C. Gen. Stat. § 7B-1110(a)(2007). Moreover, the incidents ofdomestic disputes, the parents' unwillingness or inability to take accountability for their actions and take advantage of offered services, the continued spiral of drug use and addiction were all proper "other relevant considerations" for the trial court to factor into its ruling. N.C. Gen. Stat. § 7B-1110(a)(2007).
The trial court, sitting as finder of fact in an extensive termination hearing, heard the witnesses, passed upon their credibility, and determined the "weight to be given their testimony and the reasonable inferences to be drawn therefrom." Whisnant, 71 N.C. App. at 441, 322 S.E.2d at 435. Having carefully reviewed the record, briefs and contentions of the parties, we can discern no abuse of discretion.
AFFIRMED.
Chief Judge MARTIN and Judge ELMORE concur.
Report per Rule 30(e).
NOTES
[1] It is clear from the transcripts that the court's findings were limited to those necessary to support its ruling. A pattern of prior traumatic episodes disclosed by the children appear in the record. This episode merely illustrates the continued risk of neglect to these children.