TYSON, Judge, dissenting.
The first three pages of the majority's opinion recites the past actions of the mother, who is not before this Court. It is clear the sins of the mother are being heaped upon Respondent by DHHS and the trial court. Despite his best efforts and substantial progress, Respondent never was provided his natural human rights of care, custody and control of his child and any reasonable chance to reunify with his child, as required by law. The trial court's findings of fact are not supported by clear, cogent and convincing evidence and these findings do not support the trial court's conclusion to terminate Respondent's parental rights based upon neglect under N.C. Gen.Stat. § 7B-1111(a)(1) (2013). I respectfully dissent from the majority's opinion and vote to reverse the trial court's error when it terminated Respondent's parental rights.
*695 *53 I. Standard of Review
As stated in the majority's opinion, "our standard of review for the termination of parental rights is whether the trial court's findings of fact are based upon clear, cogent and convincing evidence and whether the findings support the conclusions of law." In re Baker, 158 N.C.App. 491, 493, 581 S.E.2d 144, 146 (2003) (citations and internal quotation marks omitted). "The trial court's conclusions of law are reviewable de novo on appeal." In re D.M.M., 179 N.C.App. 383, 385, 633 S.E.2d 715, 716 (2006) (citation and internal quotation marks omitted).
As petitioner, DHHS bears the burden of proving by clear, cogent and convincing evidence the adjudicatory facts to justify termination of parental rights. In re Nolen, 117 N.C.App. 693, 698, 453 S.E.2d 220, 223 (1995). Petitioner wholly failed to meet its burden under the statute and our case law.
II. Neglect
Respondent argues: (1) the trial court erred in finding he had not gained an appreciation of the seriousness of the mother's abuse of her four older children, and he would unlikely be able to protect May from harm from a person with a "strong personality" like the mother; and, (2) the trial court erred in concluding May was neglected at the time of the termination hearing and there was a likelihood of future neglect if she were returned to the father. I agree.
The majority's opinion sets forth some of the trial court's findings, but not others. Termination of parental rights based upon neglect may not be based solely upon past conditions, which no longer exist. In re Young, 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). To terminate parental rights based upon neglect, the court must find evidence of neglect both at the time of the termination hearing and that repetition is likely to occur in the future. In re Ballard, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984).
The trial court may consider a prior adjudication of neglect, but cannot terminate parental rights on those past actions. It must also consider evidence of changed circumstances and the probability of future neglect. In re J.G.B., 177 N.C.App. 375, 381-82, 628 S.E.2d 450, 455 (2006). Here, the uncontested evidence and the record does not support the finding of neglect existed at the time of the hearing or that there is a reasonable probability Respondent will neglect May in the future.
Respondent and May's mother met in May of 2010 and began living together shortly thereafter. The mother's four older children by other *54 men were in foster care at that time. The four children were returned to their mother's home in November of 2010. May was born in February of 2011.
May and her four older half-siblings were adjudicated neglected and dependent on 6 December 2012. May's half-siblings were also adjudicated as abused. These adjudications were based upon the abuse perpetrated by the mother upon May's half-siblings. The mother was alone with the children most of the week, while Respondent worked out of town.
In the adjudication order, the trial court found that Respondent had acknowledged the mother needed help in parenting her other children and that he had intervened at times when the mother disciplined them. The mother testified she had hidden her abuse from Respondent and when he saw her questionable behavior, Respondent told her to seek help.
In the dispositional order, the trial court found that "[d]ue to the severe and continuous abuse which has resulted in multiple interventions by various Departments of Social Services with this family and the issues still not being resolved by the parents, this Court feels that the permanent plan of adoption should be considered very early in this case." The other multiple interventions by various departments of social services pertained solely to May's half-siblings, and all events occurred before Respondent met the mother and May was born.
At the first review hearing on 7 January 2013, only a month following the adjudication, the court established the permanent plan for the juveniles as adoption with a concurrent plan of reunification. The trial court ordered DHHS to proceed with termination of parental rights within sixty days.
*696 DHHS filed the petition to terminate parental rights on 20 March 2013, three months after the adjudication.
Despite the trial court's order directing DHHS to proceed with termination of parental rights just a month following the adjudication, the uncontested evidence shows Respondent continued to comply with and meet the goals of his case plan in order to reunify with his child.
Respondent entered into a case plan with DHHS in December of 2012, very soon after the adjudication. Under the case plan, Respondent agreed to: (1) obtain a parenting and psychological evaluation; (2) obtain a psychiatric evaluation and comply with mental health counseling if recommended; (3) participate in two sessions with the children's therapist for the purpose of determining whether an "apology session" would *55 be in the children's best interest; (4) complete a parenting education program; (5) permanently discontinue his relationship with the mother; and, (6) maintain employment and independent housing.
Respondent promptly complied with all aspects of his case plan except number 5. He obtained a paternity test and established paternity of May within a few weeks of May's placement in the custody of DHHS. Respondent obtained a psychological evaluation following the adjudication. The clinical psychologist who administered the evaluation opined that Respondent displayed "some personality difficulties, having depressive, avoidant and schizoid characteristics," held a "generally adequate" knowledge of parenting, and "appeared willing to permanently separate from [Mother.]" The evaluator recommended Respondent undergo a psychiatric evaluation to assess his need for medications or therapy. The evaluator believed Respondent's reunification with May was reasonable, if he continued to refrain from contact with the mother. Respondent was found to be of average intelligence, possessed adequate judgement, and reported no substance abuse issues.
Respondent subsequently submitted to a psychiatric evaluation and met the criteria for "Major Depressive Disorder Recurrent Moderate." In the termination of parental rights order, the trial court found medication had been recommended for Respondent's depression, but he was unwilling to take it. According to the social worker's testimony at the hearing, Respondent's therapist did not believe his "unwillingness to take medication was a critical issue." With regard to Respondent's hesitation about taking medication, the social worker testified, "I have never heard anything from [Respondent] or seen anything that would suggest that he has not been able to function day-to-day," and "[h]is functioning has not been impaired as far as we know."
Respondent began participating in individual therapy in August of 2013 and was successfully discharged by his therapist. The court's findings state Respondent was not forthright with his therapist regarding his use of physical discipline and his ongoing contact with the mother.
Respondent moved out of the mother's home on 2 March 2013, shortly after the adjudication. After moving out of the mother's home, Respondent exchanged text messages with the mother, sent her photographs of May, their daughter, and spoke with her on the telephone. He acknowledged through a translator that his communication with the mother was "a failure on my part." At first, he stated he was "too embarrassed" to admit that he had any contact with the mother.
*56 In a letter dated 7 November 2013, Respondent's therapist wrote that he "demonstrates awareness of his inability to protect the children resulting in the separation of the family. The incidents have been revisited and feelings resolved." The therapist further wrote that "[t]he allegations of inappropriate use of discipline were discussed and resolved. During sessions, the incidents were revisited and [Respondent] was able to demonstrate appropriate use of discipline."
Respondent's therapist also noted that Respondent admitted to contact with the mother through text messages. The therapist noted, "[b]oundaries have been discussed during sessions and how these may affect the case and having access to the child. It is my understanding that [Respondent] does not have or intends to have a relationship with child's mother."
*697 At the conclusion of Respondent's therapy, his therapist felt he had actively engaged with her and complied with the recommendations. He "demonstrated knowledge and ability to use appropriate parenting skills and discipline." This evidence is not contested.
The record shows any disclosures Respondent made or failed to make to his therapist regarding disciplining the children or maintaining contact with the mother were addressed and concluded in therapy. Uncontested evidence also shows the therapist specifically acknowledged having addressed these issues with Respondent prior to releasing him from therapy, and the issues were "resolved."
The trial court's authority over the parents of juveniles adjudicated as abused, neglected or dependent is set forth in N.C. Gen.Stat. § 7B-904 (2013). Under the statute, the court may order the parent to take the necessary steps to remedy the conditions which led to the removal of the child, including mental health treatment and parental responsibility classes. N.C. Gen.Stat. § 7B-904(c) and (d1).
In cases where there is no evidence of domestic violence or any history of severe discord between the parents, which led to the removal of the child, the statute does not authorize either the court or DHHS to order the parents to cease any and "gag" all contact between each other. Respondent entered into his case plan immediately after the adjudication prior to the permanent plan for the juveniles being established as adoption with a concurrent plan of reunification. While discontinuing Respondent's cohabitation and romantic relationship with the mother may have been "appropriate steps to remedy conditions in the home that led to or contributed to the juvenile's adjudication," forbidding any and *57 all types of communication between the parents was not. N.C. Gen.Stat. § 7B-904(d1)(3). Parents have a right to communicate concerning their mutual defense and the ongoing status and well-being of their children. In the absence of any history of violence between the parents, to impose such a "gag order" would deny the parents both their First Amendment and Due Process rights. In re Cogdill, 137 N.C.App. 504, 508, 528 S.E.2d 600, 603 (2000) ("trial court may not order a parent to undergo any course of conduct not provided for in [ N.C. Gen.Stat. § 7B-904 ]").
The trial court found Respondent stated that if May were returned to his care, he planned to leave her with the mother while he worked, if the mother had her "anger under control." The court further found "[Respondent] never demonstrated that he learned anything from therapy in terms of how he would keep [her] safe in the future. To the contrary, [Respondent] has continued to believe that allowing [Mother] to watch [May] while he works is a viable option."
These findings find no support in the evidence. The social worker testified:
Q: And did he indicate on that June date anything about the mother possibly watching the child if she could prove that she could control her anger?
A: That conversation occurred on April 4th, 2014 is referenced to being to consider [sic] leaving [May] with [Mother] during the day while he was working because she would never hurt her and to resuming a relationship with [Mother] if she could prove that she changed he said, meaning that her anger [sic].
Respondent testified through a translator:
Q: Now is it correct that as recently as May of 2014 you shared I think with the social worker if Miss Lebaron could get her anger under control you would let her visit with your daughter?
A: Well, she, the social worker, asked me a question, the therapist, and I said, well, maybe, if everybody could assure me that she was, she had changed her mind about how treating, about how to treat children maybe I would consider it.
No evidence shows Respondent intends to allow May to visit with the mother. Rather, Respondent stated he would only consider this *58 possibility as an alternative in the unlikely event the therapist and DHHS believed it would be safe to leave May in the mother's care. Furthermore, when asked what Respondent would do with May while he worked, he testified, "like any other parents I would find daycare for her."
At the time of the termination of parental rights hearing, which was held in August, September and October of 2014, no evidence was presented of any communication between *698 Respondent and the mother since the text messages were sent a year earlier in October of 2013.
When asked his plans, if he were reunited with his daughter, May, Respondent discussed moving to Pennsylvania to be nearer to his family or seeking the assistance of the mother of his grown children. Respondent also testified he would report the mother to the police or DHHS if confronted with the same conditions that led to the adjudication.
Respondent is Hispanic and an illegal alien. He attempted and was willing to participate in parenting classes, but the social worker was not able to find any bilingual classes for him to attend. The social worker testified that Respondent was allowed to address the parenting issues in individual counseling, which "often turns out to be more effective than classes." Respondent properly completed all of his therapy sessions and scheduled visits with his daughter.
Respondent has no drivers' license and depends on coworkers and others for transportation to work and his sessions and visitations. While maintaining independent employment and residence, Respondent attended all of his sessions and visit weekly with May, without his own vehicle or transportation. These actions clearly demonstrated the degree of care, concern, and love Respondent has for his daughter.
At the termination hearing, Respondent was questioned about the parenting skills he had learned during his therapy sessions. Through his interpreter, Respondent testified, "we talked a lot about being patient and how to educate children and the way you should deal with children when like they're having a tantrum for example." When asked what Respondent discussed with his therapist regarding discipline of a child, he responded, "[m]ore than anything she taught me that I need to talk to my children and be patient and teach them the things they shouldn't do." With regard to this response, the court found, "[w]hile patience is an important parenting skill, the most crucial parenting skill for the children in this case is to be protected from harm and to be made to feel safe."
Given the mother's anger and frustration with her other children prior to the adjudication, patience was an appropriate focus for Respondent's *59 therapy and improving his parental skills. While the court's finding summarized Respondent's answers to this line of questioning, no evidence supports the conclusion that he was simply "going through the motions" with regard to his therapy, visitation with his daughter, or attendance at and compliance with all the valid requirements of his case plan.
When Respondent regularly visited with May, he brought food, diapers, clothing, and toys to her. The uncontroverted evidence also shows Respondent engaged in "appropriate, positive, affectionate" interactions with May. The court denied his requests for increased visitation without explanation. At the time of the termination of parental rights hearing, the court found May continued to "share a strong bond" with Respondent, a statutory factor the trial court ignored.
Under de novo review, the trial court's conclusions that Respondent "never demonstrated that he learned anything from therapy in terms of how he would keep [May] safe," "his concern for [Mother] is greater than his desire to reunify with [May]," he "had not gained an adequate understanding of ... the seriousness of what transpired in [the] home, and the role he played in creating and fostering an injurious and abusive environment for his daughter," and, generally, that "he is unable or [un]willing to protect [May] from abuse and harm" is wholly subjective, and not supported by clear, cogent and convincing and objective evidence.
An objective case plan was established with objective criteria. Respondent completed all objective and lawful requirements of the plan. Respondent did have limited contact with the mother by telephone conversation, sending a photograph of the child, and exchanging text messages in contravention of an unlawful condition in the case plan. The last contact occurred almost a year prior to the termination of parental rights hearing. All of the objective evidence supports continued efforts by DHHS to reunify Respondent with his daughter.
The mother's abuse of her children and her significant history with child protective services led DHHS to remove May from the home. Respondent urged the mother to get *699 help, tried to intervene, and moved out of the home shortly after the adjudication. No evidence shows he had resumed a romantic or close relationship with the mother. No evidence showed he had any communication with the mother after October of 2013, almost a year prior to the termination of parental right hearing. Due to the history of the mother with child protective services, the trial court ordered DHHS to file for termination of parental rights only a month after the adjudication, leaving Respondent little real hope of reunifying with May. No evidence or adjudication shows May was ever abused. *60 Nevertheless, Respondent underwent multiple evaluations, completed therapy, established a separate residence, maintained employment, and visited, supported and maintained a strong appropriate bond with May without his own transportation. This objective evidence shows Respondent's compliance with his case plan, efforts to achieve reunification with his daughter, and to remedy of the conditions that led to May's adjudication. DHHS failed to present any clear, cogent and convincing evidence to show neglect at the time of the hearing or the probability Respondent will neglect May in the future. All of the findings of fact supporting the trial court's conclusion that Respondent is likely to neglect May in the future are speculative and subjective.
"[T]he law requires compelling evidence to terminate parental rights. The permanent removal of a child from its natural parent requires the highest level of scrutiny and should only occur where there is compelling evidence of potential risk of harm to the child or their well-being." In re Nesbitt, 147 N.C.App. 349, 361, 555 S.E.2d 659, 667 (2001). The trial court's determination that Respondent had "gone through the motions" of his case plan, but does not have the ability to keep May from harm, is also wholly subjective, speculative, unsupported by and is contrary to the record evidence. This unsupported notion does not support a conclusion to terminate parental rights under our statutes and case precedents.
The trial court's findings of fact are not supported by clear, cogent and convincing evidence, and no evidence supports the conclusion that there was neglect present at the time of the termination of parental rights hearing, or there is a likelihood of future neglect if May was reunited with her father. Ballard, 311 N.C. at 716, 319 S.E.2d at 232.
III. Conclusion
For these reasons, I vote to reverse the trial court's order terminating Respondent's parental rights based upon either neglect or dependency and remand for entry of an order to require DHHS to make continued efforts to reunify May with Respondent. I respectfully dissent.