IN THE COURT OF APPEALS OF NORTH CAROLINA

 No. COA15-238

 Filed: 1 September 2015

Guilford County, No. 12 JT 512

IN THE MATTER OF: M.P.M.

 Appeal by respondent from order entered 12 December 2014 by Judge Michelle

Fletcher in District Court, Guilford County. Heard in the Court of Appeals on 27 July

2015.

 Guilford County Department of Health and Human Services, by Mercedes O.
 Chut, for petitioner-appellee.

 Mary McCullers Reece, for respondent-appellant.

 The Opoku-Mensah Law Firm, by Gertrude Opoku-Mensah, for guardian ad
 litem.

 STROUD, Judge.

 Respondent appeals from an order terminating his parental rights to his child

M.P.M. (hereinafter referred to as “May”) on the ground that he neglected the

juvenile.1 See N.C. Gen. Stat. § 7B-1111(a)(1) (2013). Respondent contends that the

trial court erred in (1) making certain findings of fact; and (2) concluding that

Respondent neglected May at the time of the termination hearing and that there was

a likelihood of repetition of neglect. We affirm.

 1 We use pseudonyms to protect the identity of the juveniles.
 IN RE: M.P.M.

 Opinion of the Court

 I. Background

 In 1999, Arlington County Department of Social Services in Virginia took

Arnold, Mother’s son, into custody. A court in Arlington County adjudicated Arnold

to be abused and neglected, and on or about 24 October 2000, the court terminated

Mother’s parental rights as to Arnold. In 2001, Margaret was born, and in 2003, Carl

was born. In 2003, Mother began a romantic relationship with Mr. F. While on

probation in Virginia, Mother and Mr. F. moved to Mecklenburg County. In 2005,

Katie was born.

 In 2006, Mother and Mr. F. were arrested in Mecklenburg County for

absconding from their probation. They were extradited to Virginia where they began

serving prison sentences for grand larceny by credit card fraud. On or about 1

September 2006, Mecklenburg County Department of Social Services took Margaret,

Carl, and Katie into custody. On or about 18 October 2006, a district court in

Mecklenburg County adjudicated the juveniles to be neglected and dependent. In

December 2006, while in prison, Mother gave birth to Lance. In February or March

2007, Mr. F. was released from prison and moved back to Mecklenburg County. In

2008, Mr. F. gained custody of Margaret, Carl, Katie, and Lance. In July 2009,

Mother was released from prison and, in August 2009, she returned to Mecklenburg

County.

 -2-
 IN RE: M.P.M.

 Opinion of the Court

 On or about 14 August 2009, Katie was hospitalized for severe injuries she

sustained from being beaten while in the care of Mr. F. Mr. F. coached the juveniles

on what to say when asked how Katie was injured. Mecklenburg County Department

of Social Services again took custody of Margaret, Carl, Katie, and Lance, and a

district court in Mecklenburg County adjudicated the juveniles to be abused,

neglected, and dependent. Mother entered into a service agreement with

Mecklenburg County Department of Social Services to work toward regaining custody

of her children.

 In September 2009, Mother moved from Mecklenburg County to Guilford

County. In May 2010, Mother began a romantic relationship with Respondent.

Shortly thereafter, Mother and Respondent began living together. In November

2010, Mecklenburg County Department of Social Services returned Margaret, Carl,

Katie, and Lance to Mother. May, the subject juvenile of this case, was born in

February 2011, and Respondent was subsequently determined by DNA paternity

testing to be her biological father.

 During the period from November 2010 to October 2012 while the juveniles

resided with Mother and Respondent, Mother habitually physically and emotionally

abused May’s four half-siblings. This abuse included beating them, hitting them with

items such as shoes, belts, and metal hangers, kicking them in the stomach,

screaming at them, and grabbing and pulling them by the hair. Mother often held

 -3-
 IN RE: M.P.M.

 Opinion of the Court

her hand over the children’s mouths and noses to prevent them from screaming while

she beat them. She also often put her foot on their backs to hold them down on the

floor so they could not escape. During one incident when Respondent attempted to

intervene on behalf of Carl, Mother told him that Carl was her child and that he could

leave if he did not like the way she disciplined him. Respondent did leave the home,

leaving his daughter May with Mother, and returned the next morning.

 At some point between November 2010 and October 2012, Respondent began

participating in the abuse of May’s four half-siblings. On one occasion, as punishment

for playing with matches, Respondent and Mother held Carl’s face close to a hot

burner. On other occasions, Respondent hit the children with shoes, and on at least

one occasion, Respondent hit the children with a copper wire.

 On 1 October 2012, Mother threatened to strike Carl with an axe. The

following day, Margaret disclosed to a social worker the incident with the axe and the

daily abuse inflicted upon the children. On or about 3 October 2012, Guilford County

Department of Health and Human Services (“DHHS”) gained custody of all five

juveniles. On 19 December 2012, Respondent signed a service agreement that

addressed emotional and mental health, parenting, family relationships, housing,

and employment matters. On 7 January 2013, the trial court adjudicated Margaret,

Carl, Katie, and Lance to be abused, neglected, and dependent and adjudicated May

to be neglected and dependent. The trial court awarded Respondent one hour of

 -4-
 IN RE: M.P.M.

 Opinion of the Court

supervised visitation per week. On 23 January 2013, the trial court directed DHHS

to proceed with termination of parental rights. On 20 March 2013, DHHS filed a

petition to terminate the parental rights of Respondent as to May and the parental

rights of Mother as to all five children.

 Respondent took a parenting psychological evaluation with Dr. Michael

McColloch and a pre-psychiatric evaluation, but he failed to comply with Dr.

McColloch’s recommendation for a full psychiatric evaluation, because he made it

clear that he was unwilling to take any medications, which may be recommended as

a result of the evaluation. The parenting psychological evaluation noted “personality

difficulties,” including depressive, avoidant, and schizoid characteristics.

 During a session with his individual therapist, Respondent denied that he had

ever hit the children. At the time of the filing of the petition in March 2013,

Respondent agreed to move out of Mother’s home and to cease all contact with

Mother. But Respondent continued to call, text, and send photographs of May to

Mother, which he took during his visits with May, until October 2013 when Robert

McEntire, the DHHS social worker in charge of the case, discovered their continued

contact. During this period, Respondent repeatedly falsely reported to McEntire that

he was having no contact with Mother. After McEntire confronted Respondent,

Respondent explained that “he felt sorry for her” and that “she ha[d] suffered

enough.” Respondent also stated that he could resume his relationship with Mother

 -5-
 IN RE: M.P.M.

 Opinion of the Court

if he was certain that she had her anger under control, and that the risk of harm to

his daughter if she were left alone with Mother “would be no different than leaving

her with a babysitter or someone else because you can’t predict what someone will

do.” In April 2014 during a visit with May, Respondent stated that he was open to

leaving May in Mother’s care during the day because “she would never hurt her.”

 The trial court conducted the termination hearing on 11 August 2014, 8

September 2014, 9 September 2014, and 7 October 2014. On 12 December 2014, the

trial court concluded that Respondent had neglected May, that Respondent neglected

May at the time of the termination hearing, and that there is a likelihood of repetition

of neglect should Respondent regain custody of May. See N.C. Gen. Stat. § 7B-

1111(a)(1). The trial court also concluded that termination of his parental rights was

in May’s best interest. The trial court further concluded that Mother neglected all

five children and that termination of her parental rights was in their best interest.

Respondent gave timely notice of appeal.

 II. Termination of Parental Rights

A. Standard of Review

 Termination of parental rights proceedings are
 conducted in two stages: adjudication and disposition. In
 the adjudication stage, the trial court must determine
 whether there exists one or more grounds for termination
 of parental rights under N.C. Gen. Stat. § 7B-1111(a). This
 Court reviews a trial court’s conclusion that grounds exist
 to terminate parental rights to determine whether clear,
 cogent, and convincing evidence exists to support the

 -6-
 IN RE: M.P.M.

 Opinion of the Court

 court’s findings of fact, and whether the findings of fact
 support the court’s conclusions of law. If the trial court’s
 findings of fact are supported by ample, competent
 evidence, they are binding on appeal, even though there
 may be evidence to the contrary. However, the trial court’s
 conclusions of law are fully reviewable de novo by the
 appellate court.

In re A.B., ___ N.C. App. ___, ____, 768 S.E.2d 573, 575 (2015) (citations, quotations

marks, and brackets omitted).

B. Findings of Fact

 Respondent contends that the following findings are not supported by clear,

cogent, and convincing evidence:

 (1) Since [May] has been in custody, [Respondent]
 never demonstrated that he learned anything from therapy
 in terms of how he would keep [May] safe in the future. To
 the contrary, [Respondent] has continued to believe that
 allowing [Mother] to watch [May] while he works is a viable
 option. [Respondent’s] explanation for his contact with
 [Mother] was that he felt sorry for her and that she “has
 been through enough.” [Respondent’s] conduct and
 statements reveal that his concern for [Mother] is greater
 than his desire to reunify with [May].
 ....
 (3) It is clear that [Respondent] has not gained an
 adequate understanding of what unfolded during his
 relationship with [Mother], the seriousness of what
 transpired in that home, and the role he played in creating
 and fostering an injurious and abusive environment for his
 daughter.
 (4) [Respondent’s] testimony and history reveal that
 he is unable or [un]willing to protect [May] from abuse and
 harm, particularly if doing so would require excluding
 [Mother] from [May’s] life. [Respondent] does not have a
 protective instinct for his child that is strong enough to

 -7-
 IN RE: M.P.M.

 Opinion of the Court

 overcome his need to submit to a dominant personality.
 [Respondent] lacks the ability to protect [May] from a
 dominant personality such as that of [Mother].

Respondent argues that the evidence showed that he followed his case plan by

establishing paternity, undergoing mental health evaluations, engaging in parent-

centered therapy, completing his individual therapy to his therapist’s satisfaction,

establishing a home apart from Mother, eventually ceasing contact with Mother, and

engaging in regular, appropriate and affectionate visitations with May. He submits

that this evidence showed that he had demonstrated “sufficient growth as a parent

to merit a chance at reunification with his daughter.” Our dissenting colleague

agrees with Respondent and takes the position that Respondent is being punished for

Mother’s actions. Although we agree that Respondent may be a better parent than

Mother and that he made some progress, that is not the question before us. The trial

court properly addressed the concerns about each parent separately. Ultimately, the

trial court based its decision primarily upon Respondent’s failure to understand or

appreciate the extent and effects of Mother’s established pattern of child abuse and

his inability to protect May. And this is why Mother’s history of child abuse is

relevant to the determination about Respondent.

 We hold that clear, cogent, and convincing evidence supports the challenged

findings of fact. See id. at ___, 768 S.E.2d at 575. McEntire, the DHHS social worker

who had worked on this case since October 2012 when the children came into DHHS

 -8-
 IN RE: M.P.M.

 Opinion of the Court

custody, testified that, during a session with his individual therapist, Respondent

denied that he had ever hit the children. McEntire also testified that, after DHHS

had filed its petition in March 2013 and Respondent had agreed to cease all contact

with Mother, Respondent continued to call, text, and send photographs of May to

Mother, which he took during his visits with her, until October 2013 when McEntire

discovered their continued contact. McEntire testified that during this period,

Respondent repeatedly falsely reported to him that he was having no contact with

Mother. McEntire further testified that after he confronted Respondent, Respondent

explained that “he felt sorry for her” and that “she ha[d] suffered enough.” McEntire

also testified that Respondent stated that he could resume his relationship with

Mother if he was certain that she had her anger under control, and that the risk of

harm to his daughter if she were left alone with Mother “would be no different than

leaving her with a babysitter or someone else because you can’t predict what someone

will do.” McEntire further testified that, in April 2014 during a visit with May,

Respondent stated that he was open to leaving May with Mother during the day

because “she would never hurt her.” Finally, McEntire testified that he was

concerned that Respondent failed to comprehend the dangers or risks involved in

resuming a relationship with Mother or allowing May to remain alone with Mother.

 In addition, although Respondent did have a parenting psychological

evaluation and a pre-psychiatric evaluation, he failed to comply with Dr. McColloch’s

 -9-
 IN RE: M.P.M.

 Opinion of the Court

recommendation for a full psychiatric evaluation, because he made it clear that he

was unwilling to take any medications, which may be recommended as a result of the

evaluation. The parenting psychological evaluation noted “personality difficulties,”

including depressive, avoidant, and schizoid characteristics. Accordingly, we hold

that clear, cogent, and convincing evidence supports the challenged findings of fact.

See id., 768 S.E.2d at 575.

C. Conclusion of Law

 Respondent next contends that the trial court erred in concluding that

Respondent neglected May at the time of the termination hearing and that there was

a likelihood of repetition of neglect. To terminate parental rights pursuant to N.C.

Gen. Stat. § 7B-1111(a)(1), the trial court must conclude that the parent has abused

or neglected the juvenile. N.C. Gen. Stat. § 7B-1111(a)(1). N.C. Gen. Stat. § 7B-

101(15) defines a “neglected juvenile” as

 [a] juvenile who does not receive proper care, supervision,
 or discipline from the juvenile’s parent, guardian,
 custodian, or caretaker; or who has been abandoned; or
 who is not provided necessary medical care; or who is not
 provided necessary remedial care; or who lives in an
 environment injurious to the juvenile’s welfare; or who has
 been placed for care or adoption in violation of law. In
 determining whether a juvenile is a neglected juvenile, it
 is relevant whether that juvenile lives in a home where
 another juvenile has died as a result of suspected abuse or
 neglect or lives in a home where another juvenile has been
 subjected to abuse or neglect by an adult who regularly
 lives in the home.

 - 10 -
 IN RE: M.P.M.

 Opinion of the Court

Id. § 7B-101(15) (2013) (emphasis added).

 “A finding of neglect sufficient to terminate parental rights must be based on

evidence showing neglect at the time of the termination proceeding.” In re Young,

346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997). The trial court must consider evidence

of any changed circumstances since the time of a prior adjudication of neglect and the

probability that the neglect will be repeated if the child is returned to the parent’s

care. In re Ballard, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984). In predicting the

probability of repetition of neglect, the court “must assess whether there is a

substantial risk of future abuse or neglect of a child based on the historical facts of

the case.” In re McLean, 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999).

 Here, the trial court made the following findings of fact in support of its

conclusion of neglect:

 36. Grounds exist to terminate the parental rights
 of [Respondent] pursuant to N.C.G.S. § 7B-1111(a)(1).
 [Respondent] has neglected the juvenile [May], the neglect
 continues to date, and there is a likelihood of the repetition
 of neglect if [May] were returned to [Respondent].
 [Respondent’s] past neglect includes his use of
 inappropriate discipline on [May’s] older siblings with
 [May] in the home, including hitting the siblings with
 sandals and assisting [Mother] in holding [Carl’s] face close
 to a hot burner and his failure to protect [May] from the
 abusive environment of the home he shared with [Mother].
 [Respondent] demonstrated a lack of protective instinct
 and allowed his relationship with [Mother] to dominate
 over the safety of his child and her siblings. [Respondent]
 demonstrated poor parenting judgment by leaving the
 residence during [Carl’s] beating and not taking protective

 - 11 -
 IN RE: M.P.M.

 Opinion of the Court

measures such as contacting police or at least removing his
own child. When [Respondent] was asked why he did not
take the children or at least [May] with him, [Respondent]
responded that he did not want to make [Mother] angry.
[Respondent’s] own fear caused him to leave his daughter
and her siblings alone with a violent perpetrator, revealing
that his fear is greater than his protective instinct.
[Respondent’s] neglect of [May] has been ongoing through
the present and he is currently neglecting [May] as
indicated below.
 k. [(sic)] [Respondent] was not fully
 forthright and honest with Dr. McColloch or his
 therapist as required to adequately address his
 issues. In the report of the Parenting/Psychological
 Evaluation performed on [Respondent], Dr.
 McColloch noted that [Respondent] was convincing
 in his assertion that he could end his relationship
 with [Mother] and that he had no problem with not
 having contact with her. Despite appearing
 convincing to Dr. McColloch, [Respondent] did not
 cease his contact with [Mother]. Furthermore
 [Respondent] did not disclose to Dr. McColloch that
 he had participated in the abuse by hitting [May’s]
 siblings with items such as a sandal and by assisting
 [Mother] in holding [Carl’s] face close to a hot
 burner. [Respondent] also did not inform his
 individual therapist of his continued contact with
 [Mother] until after the Social Worker informed the
 therapist of the contact and the therapist confronted
 [Respondent].
 l. From the outset of the case, [Respondent]
 was allowed to have supervised visitation with
 [May] for one hour once a week. Although
 [Respondent] requested that the Court increase his
 visits, the Court declined to do so during the two
 years [May] has been in custody. The Court in the
 underlying juvenile proceeding never increased
 [Respondent’s] visits and never advanced
 [Respondent] to having unsupervised visits. It is
 clear that the Court in the underlying juvenile

 - 12 -
 IN RE: M.P.M.

 Opinion of the Court

proceeding determined that [Respondent] had not
reached a point where he could safely and effectively
have unsupervised visits with [May].
 m. It is clear that [Respondent] complied with
the requirements of his service agreement in terms
of attending appointments and completing tasks.
However, the particular circumstances of this case
require more than going through the motions of
attending ten therapy sessions and interacting
appropriately during one hour weekly supervised
visitation sessions. When asked during this trial
what he learned from his individual therapy,
[Respondent’s] response was only that he learned to
be patient with the children and to give them things.
[Respondent] has not learned that his first
responsibility is to protect his daughter. While
patience is an important parenting skill, the most
crucial parenting skill for the children in this case is
to be protected from harm and to be made to feel
safe.
 (1) Since [May] has been in custody,
 [Respondent] never demonstrated that he
 learned anything from therapy in terms of
 how he would keep [May] safe in the future.
 To the contrary, [Respondent] has continued
 to believe that allowing [Mother] to watch
 [May] while he works is a viable option.
 [Respondent’s] explanation for his contact
 with [Mother] was that he felt sorry for her
 and that she “has been through enough.”
 [Respondent’s] conduct and statements reveal
 that his concern for [Mother] is greater than
 his desire to reunify with [May].
 (2) The Court observed [Respondent]
 throughout all of the hearing dates for this
 trial and throughout all of the testimony that
 was relayed during this trial. [Respondent]
 showed no emotion and a complete lack of
 empathy during the testimony describing
 what the children went through in his home.

 - 13 -
 IN RE: M.P.M.

 Opinion of the Court

 At the close of the evidence on grounds, when
 the Court announced its decision that
 grounds exist to terminate the parental rights
 of each of the parents, [Respondent] smiled.
 Upon seeing this, the Court specifically asked
 [Respondent] if he understood the Court’s
 decision and [Respondent] responded in the
 affirmative and offered no explanation for his
 inappropriate expression.
 (3) It is clear that [Respondent] has not
 gained an adequate understanding of what
 unfolded during his relationship with
 [Mother], the seriousness of what transpired
 in that home, and the role he played in
 creating and fostering an injurious and
 abusive environment for his daughter.
 (4) [Respondent’s] testimony and
 history reveal that he is unable or [un]willing
 to protect [May] from abuse and harm,
 particularly if doing so would require
 excluding [Mother] from [May’s] life.
 [Respondent] does not have a protective
 instinct for his child that is strong enough to
 overcome his need to submit to a dominant
 personality. [Respondent] lacks the ability to
 protect [May] from a dominant personality
 such as that of [Mother].
 n. There is a likelihood of the repetition of
neglect by [Respondent]. It is reasonably
foreseeable that [Respondent’s] neglectful behaviors
would continue and that he would again allow [May]
to live in an injurious environment if [May] were
returned to him. Prior to removal, [Respondent] did
not believe that [Mother] or the abusive
environment in his home posed a risk to [May’s]
physical or emotional well-being. It is clear from his
testimony during this hearing that, despite the
therapy he received and the juvenile court
proceedings he has participated in, [Respondent]
continues to believe that is true.

 - 14 -
 IN RE: M.P.M.

 Opinion of the Court

 We hold that the above findings of fact support the trial court’s conclusion of

law that Respondent neglected May at the time of the termination hearing and that

he was likely to repeat the neglect. DHHS removed May from Respondent and

Mother’s home, because Respondent and Mother severely abused May’s siblings. But

as discussed above, during an individual therapy session, Respondent denied that he

had ever hit the children. From April 2013 to October 2013, Respondent repeatedly

reported that he had no contact with Mother, when, in fact, he was calling, texting,

and sending her photographs of May. Additionally, Respondent stated that he still

believes that allowing Mother to watch May during the day is an appropriate option.

 Respondent specifically asserts that the trial court’s findings of fact that during

the termination hearing, Respondent “showed no emotion and a complete lack of

empathy” and that he inappropriately smiled do not support its conclusion of neglect.

But “[a]ll of the findings of fact regarding respondent’s in-court demeanor, attitude,

and credibility . . . are left to the trial judge’s discretion.” In re Oghenekevebe, 123

N.C. App. 434, 440-41, 473 S.E.2d 393, 398-99 (1996). The trial court properly

considered respondent’s in-court demeanor in determining whether Respondent

properly appreciated the harmfulness of his and Mother’s prior abuse. In fact, in this

particular case, the trial court’s evaluation of Respondent’s credibility and demeanor

was crucial to the issues presented, but even upon our review of the cold written

 - 15 -
 IN RE: M.P.M.

 Opinion of the Court

record, the reasons for the trial court’s findings on these facts are entirely supported

by the evidence.

 Given the severity of Mother and Respondent’s abuse of May’s siblings,

Respondent’s dishonesty with respect to his role in the abuse and his continued

contact with Mother, and Respondent’s continued lack of understanding of the danger

that Mother poses to May, we hold that the trial court did not err in determining that

“there is a substantial risk of future abuse or neglect of a child based on the historical

facts of the case.” See McLean, 135 N.C. App. at 396, 521 S.E.2d at 127. Accordingly,

we hold that the findings of fact support the trial court’s conclusion of law that

Respondent neglected May at the time of the termination hearing and that there was

a likelihood of repetition of neglect.

 III. Conclusion

 For the foregoing reasons, we affirm the trial court’s order terminating

Respondent’s parental rights.

 AFFIRMED.

 Judge GEER concurs.

 Judge TYSON dissents.

 - 16 -
 No. COA15-238 – In re: M.P.M.

 TYSON, Judge, dissenting.

 The first three pages of the majority’s opinion recites the past actions of the

mother, who is not before this Court. It is clear the sins of the mother are being

heaped upon Respondent by DHHS and the trial court. Despite his best efforts and

substantial progress, Respondent never was provided his natural human rights of

care, custody and control of his child and any reasonable chance to reunify with his

child, as required by law. The trial court’s findings of fact are not supported by clear,

cogent and convincing evidence and these findings do not support the trial court’s

conclusion to terminate Respondent’s parental rights based upon neglect under N.C.

Gen. Stat. § 7B-1111(a)(1) (2013). I respectfully dissent from the majority’s opinion

and vote to reverse the trial court’s error when it terminated Respondent’s parental

rights.

 I. Standard of Review

 As stated in the majority’s opinion, “our standard of review for the termination

of parental rights is whether the trial court’s findings of fact are based upon clear,

cogent and convincing evidence and whether the findings support the conclusions of

law.” In re Baker, 158 N.C. App. 491, 493, 581 S.E.2d 144, 146 (2003) (citations and

internal quotation marks omitted). “The trial court’s conclusions of law are

reviewable de novo on appeal.” In re D.M.M., 179 N.C. App. 383, 385, 633 S.E.2d 715,

716 (2006) (citation and internal quotation marks omitted).
 IN RE: M.P.M.

 Tyson, J., dissenting

 As petitioner, DHHS bears the burden of proving by clear, cogent and

convincing evidence the adjudicatory facts to justify termination of parental rights.

In re Nolen, 117 N.C. App. 693, 698, 453 S.E.2d 220, 223 (1995). Petitioner wholly

failed to meet its burden under the statute and our case law.

 II. Neglect

 Respondent argues: (1) the trial court erred in finding he had not gained an

appreciation of the seriousness of the mother’s abuse of her four older children, and

he would unlikely be able to protect May from harm from a person with a “strong

personality” like the mother; and, (2) the trial court erred in concluding May was

neglected at the time of the termination hearing and there was a likelihood of future

neglect if she were returned to the father. I agree.

 The majority’s opinion sets forth some of the trial court’s findings, but not

others. Termination of parental rights based upon neglect may not be based solely

upon past conditions, which no longer exist. In re Young, 346 N.C. 244, 248, 485

S.E.2d 612, 615 (1997). To terminate parental rights based upon neglect, the court

must find evidence of neglect both at the time of the termination hearing and that

repetition is likely to occur in the future. In re Ballard, 311 N.C. 708, 716, 319 S.E.2d

227, 232 (1984).

 The trial court may consider a prior adjudication of neglect, but cannot

terminate parental rights on those past actions. It must also consider evidence of

 2
 IN RE: M.P.M.

 Tyson, J., dissenting

changed circumstances and the probability of future neglect. In re J.G.B., 177 N.C.

App. 375, 381-82, 628 S.E.2d 450, 455 (2006). Here, the uncontested evidence and

the record does not support the finding of neglect existed at the time of the hearing

or that there is a reasonable probability Respondent will neglect May in the future.

 Respondent and May’s mother met in May of 2010 and began living together

shortly thereafter. The mother’s four older children by other men were in foster care

at that time. The four children were returned to their mother’s home in November of

2010. May was born in February of 2011.

 May and her four older half-siblings were adjudicated neglected and dependent

on 6 December 2012. May’s half-siblings were also adjudicated as abused. These

adjudications were based upon the abuse perpetrated by the mother upon May’s half-

siblings. The mother was alone with the children most of the week, while Respondent

worked out of town.

 In the adjudication order, the trial court found that Respondent had

acknowledged the mother needed help in parenting her other children and that he

had intervened at times when the mother disciplined them. The mother testified she

had hidden her abuse from Respondent and when he saw her questionable behavior,

Respondent told her to seek help.

 In the dispositional order, the trial court found that “[d]ue to the severe and

continuous abuse which has resulted in multiple interventions by various

 3
 IN RE: M.P.M.

 Tyson, J., dissenting

Departments of Social Services with this family and the issues still not being resolved

by the parents, this Court feels that the permanent plan of adoption should be

considered very early in this case.” The other multiple interventions by various

departments of social services pertained solely to May’s half-siblings, and all events

occurred before Respondent met the mother and May was born.

 At the first review hearing on 7 January 2013, only a month following the

adjudication, the court established the permanent plan for the juveniles as adoption

with a concurrent plan of reunification. The trial court ordered DHHS to proceed

with termination of parental rights within sixty days. DHHS filed the petition to

terminate parental rights on 20 March 2013, three months after the adjudication.

 Despite the trial court’s order directing DHHS to proceed with termination of

parental rights just a month following the adjudication, the uncontested evidence

shows Respondent continued to comply with and meet the goals of his case plan in

order to reunify with his child.

 Respondent entered into a case plan with DHHS in December of 2012, very

soon after the adjudication. Under the case plan, Respondent agreed to: (1) obtain a

parenting and psychological evaluation; (2) obtain a psychiatric evaluation and

comply with mental health counseling if recommended; (3) participate in two sessions

with the children’s therapist for the purpose of determining whether an “apology

session” would be in the children’s best interest; (4) complete a parenting education

 4
 IN RE: M.P.M.

 Tyson, J., dissenting

program; (5) permanently discontinue his relationship with the mother; and, (6)

maintain employment and independent housing.

 Respondent promptly complied with all aspects of his case plan except number

5. He obtained a paternity test and established paternity of May within a few weeks

of May’s placement in the custody of DHHS. Respondent obtained a psychological

evaluation following the adjudication. The clinical psychologist who administered

the evaluation opined that Respondent displayed “some personality difficulties,

having depressive, avoidant and schizoid characteristics,” held a “generally

adequate” knowledge of parenting, and “appeared willing to permanently separate

from [Mother.]” The evaluator recommended Respondent undergo a psychiatric

evaluation to assess his need for medications or therapy. The evaluator believed

Respondent’s reunification with May was reasonable, if he continued to refrain from

contact with the mother. Respondent was found to be of average intelligence,

possessed adequate judgement, and reported no substance abuse issues.

 Respondent subsequently submitted to a psychiatric evaluation and met the

criteria for “Major Depressive Disorder Recurrent Moderate.” In the termination of

parental rights order, the trial court found medication had been recommended for

Respondent’s depression, but he was unwilling to take it. According to the social

worker’s testimony at the hearing, Respondent’s therapist did not believe his

“unwillingness to take medication was a critical issue.” With regard to Respondent’s

 5
 IN RE: M.P.M.

 Tyson, J., dissenting

hesitation about taking medication, the social worker testified, “I have never heard

anything from [Respondent] or seen anything that would suggest that he has not

been able to function day-to-day,” and “[h]is functioning has not been impaired as far

as we know.”

 Respondent began participating in individual therapy in August of 2013 and

was successfully discharged by his therapist. The court’s findings state Respondent

was not forthright with his therapist regarding his use of physical discipline and his

ongoing contact with the mother.

 Respondent moved out of the mother’s home on 2 March 2013, shortly after the

adjudication. After moving out of the mother’s home, Respondent exchanged text

messages with the mother, sent her photographs of May, their daughter, and spoke

with her on the telephone. He acknowledged through a translator that his

communication with the mother was “a failure on my part.” At first, he stated he was

“too embarrassed” to admit that he had any contact with the mother.

 In a letter dated 7 November 2013, Respondent’s therapist wrote that he

“demonstrates awareness of his inability to protect the children resulting in the

separation of the family. The incidents have been revisited and feelings resolved.”

The therapist further wrote that “[t]he allegations of inappropriate use of discipline

were discussed and resolved. During sessions, the incidents were revisited and

[Respondent] was able to demonstrate appropriate use of discipline.”

 6
 IN RE: M.P.M.

 Tyson, J., dissenting

 Respondent’s therapist also noted that Respondent admitted to contact with

the mother through text messages. The therapist noted, “[b]oundaries have been

discussed during sessions and how these may affect the case and having access to the

child. It is my understanding that [Respondent] does not have or intends to have a

relationship with child’s mother.”

 At the conclusion of Respondent’s therapy, his therapist felt he had actively

engaged with her and complied with the recommendations. He “demonstrated

knowledge and ability to use appropriate parenting skills and discipline.” This

evidence is not contested.

 The record shows any disclosures Respondent made or failed to make to his

therapist regarding disciplining the children or maintaining contact with the mother

were addressed and concluded in therapy. Uncontested evidence also shows the

therapist specifically acknowledged having addressed these issues with Respondent

prior to releasing him from therapy, and the issues were “resolved.”

 The trial court’s authority over the parents of juveniles adjudicated as abused,

neglected or dependent is set forth in N.C. Gen. Stat. § 7B-904 (2013). Under the

statute, the court may order the parent to take the necessary steps to remedy the

conditions which led to the removal of the child, including mental health treatment

and parental responsibility classes. N.C. Gen. Stat. § 7B-904(c) and (d1).

 7
 IN RE: M.P.M.

 Tyson, J., dissenting

 In cases where there is no evidence of domestic violence or any history of severe

discord between the parents, which led to the removal of the child, the statute does

not authorize either the court or DHHS to order the parents to cease any and “gag”

all contact between each other. Respondent entered into his case plan immediately

after the adjudication prior to the permanent plan for the juveniles being established

as adoption with a concurrent plan of reunification. While discontinuing

Respondent’s cohabitation and romantic relationship with the mother may have been

“appropriate steps to remedy conditions in the home that led to or contributed to the

juvenile’s adjudication,” forbidding any and all types of communication between the

parents was not. N.C. Gen. Stat. § 7B-904(d1)(3). Parents have a right to

communicate concerning their mutual defense and the ongoing status and well-being

of their children. In the absence of any history of violence between the parents, to

impose such a “gag order” would deny the parents both their First Amendment and

Due Process rights. In re Cogdill, 137 N.C. App. 504, 508, 528 S.E.2d 600, 603 (2000)

(“trial court may not order a parent to undergo any course of conduct not provided for

in [N.C. Gen. Stat. § 7B-904]”).

 The trial court found Respondent stated that if May were returned to his care,

he planned to leave her with the mother while he worked, if the mother had her

“anger under control.” The court further found “[Respondent] never demonstrated

that he learned anything from therapy in terms of how he would keep [her] safe in

 8
 IN RE: M.P.M.

 Tyson, J., dissenting

the future. To the contrary, [Respondent] has continued to believe that allowing

[Mother] to watch [May] while he works is a viable option.”

 These findings find no support in the evidence. The social worker testified:

 Q: And did he indicate on that June date anything about
 the mother possibly watching the child if she could prove
 that she could control her anger?

 A: That conversation occurred on April 4th, 2014 is
 referenced to being to consider [sic] leaving [May] with
 [Mother] during the day while he was working because she
 would never hurt her and to resuming a relationship with
 [Mother] if she could prove that she changed he said,
 meaning that her anger [sic].

Respondent testified through a translator:

 Q: Now is it correct that as recently as May of 2014 you
 shared I think with the social worker if Miss Lebaron could
 get her anger under control you would let her visit with
 your daughter?

 A: Well, she, the social worker, asked me a question,
 the therapist, and I said, well, maybe, if everybody could
 assure me that she was, she had changed her mind about
 how treating, about how to treat children maybe I would
 consider it.

 No evidence shows Respondent intends to allow May to visit with the mother.

Rather, Respondent stated he would only consider this possibility as an alternative

in the unlikely event the therapist and DHHS believed it would be safe to leave May

in the mother’s care. Furthermore, when asked what Respondent would do with May

while he worked, he testified, “like any other parents I would find daycare for her.”

 9
 IN RE: M.P.M.

 Tyson, J., dissenting

 At the time of the termination of parental rights hearing, which was held in

August, September and October of 2014, no evidence was presented of any

communication between Respondent and the mother since the text messages were

sent a year earlier in October of 2013.

 When asked his plans, if he were reunited with his daughter, May, Respondent

discussed moving to Pennsylvania to be nearer to his family or seeking the assistance

of the mother of his grown children. Respondent also testified he would report the

mother to the police or DHHS if confronted with the same conditions that led to the

adjudication.

 Respondent is Hispanic and an illegal alien. He attempted and was willing to

participate in parenting classes, but the social worker was not able to find any

bilingual classes for him to attend. The social worker testified that Respondent was

allowed to address the parenting issues in individual counseling, which “often turns

out to be more effective than classes.” Respondent properly completed all of his

therapy sessions and scheduled visits with his daughter.

 Respondent has no drivers’ license and depends on coworkers and others for

transportation to work and his sessions and visitations. While maintaining

independent employment and residence, Respondent attended all of his sessions and

visit weekly with May, without his own vehicle or transportation. These actions

 10
 IN RE: M.P.M.

 Tyson, J., dissenting

clearly demonstrated the degree of care, concern, and love Respondent has for his

daughter.

 At the termination hearing, Respondent was questioned about the parenting

skills he had learned during his therapy sessions. Through his interpreter,

Respondent testified, “we talked a lot about being patient and how to educate children

and the way you should deal with children when like they’re having a tantrum for

example.” When asked what Respondent discussed with his therapist regarding

discipline of a child, he responded, “[m]ore than anything she taught me that I need

to talk to my children and be patient and teach them the things they shouldn’t do.”

With regard to this response, the court found, “[w]hile patience is an important

parenting skill, the most crucial parenting skill for the children in this case is to be

protected from harm and to be made to feel safe.”

 Given the mother’s anger and frustration with her other children prior to the

adjudication, patience was an appropriate focus for Respondent’s therapy and

improving his parental skills. While the court’s finding summarized Respondent’s

answers to this line of questioning, no evidence supports the conclusion that he was

simply “going through the motions” with regard to his therapy, visitation with his

daughter, or attendance at and compliance with all the valid requirements of his case

plan.

 11
 IN RE: M.P.M.

 Tyson, J., dissenting

 When Respondent regularly visited with May, he brought food, diapers,

clothing, and toys to her. The uncontroverted evidence also shows Respondent

engaged in “appropriate, positive, affectionate” interactions with May. The court

denied his requests for increased visitation without explanation. At the time of the

termination of parental rights hearing, the court found May continued to “share a

strong bond” with Respondent, a statutory factor the trial court ignored.

 Under de novo review, the trial court’s conclusions that Respondent “never

demonstrated that he learned anything from therapy in terms of how he would keep

[May] safe,” “his concern for [Mother] is greater than his desire to reunify with

[May],” he “had not gained an adequate understanding of . . . the seriousness of what

transpired in [the] home, and the role he played in creating and fostering an injurious

and abusive environment for his daughter,” and, generally, that “he is unable or

[un]willing to protect [May] from abuse and harm” is wholly subjective, and not

supported by clear, cogent and convincing and objective evidence.

 An objective case plan was established with objective criteria. Respondent

completed all objective and lawful requirements of the plan. Respondent did have

limited contact with the mother by telephone conversation, sending a photograph of

the child, and exchanging text messages in contravention of an unlawful condition in

the case plan. The last contact occurred almost a year prior to the termination of

 12
 IN RE: M.P.M.

 Tyson, J., dissenting

parental rights hearing. All of the objective evidence supports continued efforts by

DHHS to reunify Respondent with his daughter.

 The mother’s abuse of her children and her significant history with child

protective services led DHHS to remove May from the home. Respondent urged the

mother to get help, tried to intervene, and moved out of the home shortly after the

adjudication. No evidence shows he had resumed a romantic or close relationship

with the mother. No evidence showed he had any communication with the mother

after October of 2013, almost a year prior to the termination of parental right hearing.

Due to the history of the mother with child protective services, the trial court ordered

DHHS to file for termination of parental rights only a month after the adjudication,

leaving Respondent little real hope of reunifying with May. No evidence or

adjudication shows May was ever abused.

 Nevertheless, Respondent underwent multiple evaluations, completed

therapy, established a separate residence, maintained employment, and visited,

supported and maintained a strong appropriate bond with May without his own

transportation. This objective evidence shows Respondent’s compliance with his case

plan, efforts to achieve reunification with his daughter, and to remedy of the

conditions that led to May’s adjudication. DHHS failed to present any clear, cogent

and convincing evidence to show neglect at the time of the hearing or the probability

Respondent will neglect May in the future. All of the findings of fact supporting the

 13
 IN RE: M.P.M.

 Tyson, J., dissenting

trial court’s conclusion that Respondent is likely to neglect May in the future are

speculative and subjective.

 “[T]he law requires compelling evidence to terminate parental rights. The

permanent removal of a child from its natural parent requires the highest level of

scrutiny and should only occur where there is compelling evidence of potential risk of

harm to the child or their well-being.” In re Nesbitt, 147 N.C. App. 349, 361, 555

S.E.2d 659, 667 (2001). The trial court’s determination that Respondent had “gone

through the motions” of his case plan, but does not have the ability to keep May from

harm, is also wholly subjective, speculative, unsupported by and is contrary to the

record evidence. This unsupported notion does not support a conclusion to terminate

parental rights under our statutes and case precedents.

 The trial court’s findings of fact are not supported by clear, cogent and

convincing evidence, and no evidence supports the conclusion that there was neglect

present at the time of the termination of parental rights hearing, or there is a

likelihood of future neglect if May was reunited with her father. Ballard, 311 N.C. at

716, 319 S.E.2d at 232.

 III. Conclusion

 For these reasons, I vote to reverse the trial court’s order terminating

Respondent’s parental rights based upon either neglect or dependency and remand

 14
 IN RE: M.P.M.

 Tyson, J., dissenting

for entry of an order to require DHHS to make continued efforts to reunify May with

Respondent. I respectfully dissent.

 15